[No. D048640. Fourth Dist., Div. One. June 26, 2007.]

SERGIO JUAREZ et al., Plaintiffs and Appellants, v.
ARCADIA FINANCIAL, LTD., Defendant and Respondent.

## Counsel

Kemnitzer, Anderson, Barron & Ogilvie, Andrew J. Ogilvie, Carol McLean Brewer; and Michael E. Lindsey for Plaintiffs and Appellants.

Severson & Werson, Jan T. Chilton, Regina Jill McClendon and John B. Sullivan for Defendant and Respondent.

**OPINION**

**AARON, J.—**

I.

INTRODUCTION

Plaintiffs Sergio and Laura Juarez appeal from a judgment entered in favor of defendant Arcadia Financial, Ltd. (Arcadia), on the Juarezes' class claims. The Juarezes filed an action against Arcadia in which they asserted both individual claims and claims brought on behalf of a class, pursuant to the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.). The Juarezes allege that Arcadia engaged in unlawful, unfair and fraudulent business practices by violating the requirements of the Rees-Levering Automobile Sales Finance Act (Rees-Levering or the Act) (Civ. Code, § 2983 et seq.).[1]

Rees-Levering provides a detailed framework that governs conditional sales contracts for motor vehicles. Under the Act, defaulting buyers whose cars have been repossessed by a creditor must be given the opportunity to redeem their vehicles by paying the full balance due under the contract. The Act also requires that defaulting buyers be given the opportunity, in many circumstances, to reinstate their contracts by curing the default and meeting certain other conditions set by the creditor. From the buyer's perspective, the option of reinstating a contract is often preferable to redemption, because reinstatement allows the buyer to recover the car without having to pay the full balance due on the contract, as is required in order to redeem the vehicle.

The Act requires that creditors provide a defaulting buyer with a notice of intention (NOI) to dispose of the repossessed vehicle. To ensure that a defaulting buyer is made aware of his or her right to redeem or reinstate prior to the creditor disposing of the vehicle, the Act requires that creditors include in the NOI information about the buyer's right to redeem or reinstate.[2] The Act further requires that the NOI set forth "all the conditions precedent" to reinstatement. (§ 2983.2, subd. (a)(2).)

The Juarezes contend that the notices Arcadia sends to defaulting buyers violate the requirement that an NOI inform the buyer of "all the conditions

---

[1] Further statutory references are to the Civil Code unless otherwise indicated.

[2] There are limited circumstances in which a creditor does not have to allow the defaulting buyer the opportunity to reinstate the contract. (§ 2983.3, subd. (b).) The creditor must notify defaulting buyers who are not given the option to reinstate their contracts of the reasons why reinstatement is not an available option for them. (§ 2983.2, subd. (a)(2).)

precedent" to reinstatement because Arcadia's NOI's do not inform defaulting parties of the dollar amounts necessary to reinstate their contracts. In their complaint, the Juarezes seek the return of money Arcadia obtained by collecting deficiency claims and deficiency judgments pursuant to the defective NOI's from buyers who ultimately did not redeem their vehicles or reinstate their contracts.

Arcadia moved for summary judgment on the class claims, asserting that the relevant facts were undisputed and that the Juarezes' class claims failed as a matter of law because Arcadia's NOI satisfies the requirements of Rees-Levering. The trial court agreed that there were no material facts in dispute and concluded that Arcadia's NOI's comply with the requirements of section 2983.2, subdivision (a)(2), even though the notices do not include the dollar amounts required to reinstate the contract.

On appeal, the Juarezes contend that the trial court erroneously interpreted the meaning of the phrase "all the conditions precedent" as it is used in Rees-Levering in concluding that Arcadia's generic description of the types of things a buyer must do to reinstate a contract satisfy the requirement that the NOI set forth "all the conditions precedent." Arcadia contends that Rees-Levering requires that it provide the buyer with "only a general statement of the acts or events that must occur before the contract is reinstated," and that the Act does not require that Arcadia provide defaulting buyers with more specific information as to how they can reinstate their contracts.

The Juarezes also challenge the trial court's denial of their motion to compel Arcadia to provide responses to three interrogatories seeking information as to how Arcadia maintained the funds it is alleged to have wrongfully collected from the plaintiff class and whether those funds earned profits. The trial court denied the Juarezes' request for responses to these interrogatories on the basis that plaintiffs "do not have an ownership interest" in the "lost profits" they seek.

We conclude that Arcadia's NOI's are insufficient under Rees-Levering. Arcadia's recitation of the general conditions for reinstatement does not adequately or reasonably apprise the buyer of "all the conditions precedent" to reinstatement.

We further conclude that the trial court should have granted plaintiffs' motion to compel discovery regarding Arcadia's accounting practices and any profits it made from payments it is alleged to have wrongfully obtained from plaintiffs.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Factual background*

#### 1. *The Juarezes' experience with Arcadia*

In December 1999, the Juarezes purchased a used Isuzu Rodeo from Ron Baker Chevrolet under a conditional sales contract that obligated them to make monthly payments. After the Juarezes purchased the Isuzu, the dealer assigned its rights in the conditional sales contract to Arcadia. On July 10, 2003, Arcadia repossessed the Isuzu, based on Arcadia's belief that the Juarezes had failed to make two car payments.[3]

On the day their vehicle was repossessed, the Juarezes each made separate telephone calls to Arcadia to find out how they could get it back. The Juarezes were each told that in order to recover their vehicle, they would have to pay $14,000, which was the balance remaining on their contract. The Juarezes were not told that they had the right to reinstate the contract for an amount less than the full contract balance.

A few days after the vehicle was repossessed, the Juarezes received Arcadia's NOI, which was dated July 11, 2003. The envelope in which the NOI arrived bore a postmark of July 15, 2003, and had an out-of-state zip code.[4] The Juarezes do not remember on what date they received the NOI.

The NOI informed the Juarezes that Arcadia had taken possession of the Isuzu and that it was planning to dispose of the vehicle 20 days from the date of the letter. In the first paragraph, the NOI informed the Juarezes that they "have the right to redeem the motor vehicle by paying the undersigned at the address indicated below the full amount shown below as 'Total Due,' within 20 days of the date of this notice, unless extension is granted as provided below." According to the NOI, the Juarezes would be required to pay a total of $13,763.06 to redeem their car.

On page 2 of the letter, next to the statement, "You may reinstate the contract within 20 days of the date of this notice under the following conditions" was a box marked with an "x." The conditions listed under this statement were "[p]ayment of all past due installments, late payment

---

[3] The Juarezes originally disputed Arcadia's claim that they were delinquent in making their payments for the Isuzu.

[4] The zip code on the postmark appears to be 48195.

penalties, repossession costs, resale expenses and storage fees (if any), and payment of repossession fee to local law enforcement agency." While some dollar figures were included in the redemption section of the NOI, the notice did not inform the Juarezes of any amounts they would have to pay to *reinstate* their contract.

The Juarezes attempted to use the figures that were provided in the redemption section of the NOI to calculate how much they would have to pay to reinstate their contract. They concluded that the amount required to reinstate was $784.50. The Juarezes sent that amount to Arcadia by overnight delivery on July 30, 2003. Arcadia retained the $784.50 from the Juarezes, but did not inform the Juarezes that this amount was insufficient for reinstatement.

The Juarezes waited to hear from Arcadia. On August 6, after not having heard from Arcadia, Laura called Arcadia to inquire about the status of the repossession. Laura's call went to an answering machine. She left a message asking that someone call her back. Arcadia did not return the call until August 12. On that date, an Arcadia representative told Sergio that the Juarezes would have to pay an additional $400 in order to get the Isuzu back. The representative did not mention anything about the local law enforcement fee or the towing fee that the Juarezes would also have to pay in order to reinstate the contract.

Arcadia ultimately sold the Juarezes' vehicle. Arcadia alleges in its cross-complaint that the Juarezes still owe an unpaid balance of $12,942.54 on the contract.

### 2. *Discovery from Arcadia*

The Juarezes deposed Wendy Wolter, Arcadia's director of operations, who Arcadia had identified as the person most knowledgeable about the case. Wolter testified that Arcadia knew exactly how much money was required for reinstatement of the Juarezes' contract when it sent the NOI to them, but that it did not include that figure in the notice. During her deposition, Wolter calculated that as of the date of the NOI, the Juarezes would have had to pay $784.50 to reinstate the contract. She further testified that the Juarezes would not have been required to pay a local law enforcement fee because law enforcement agencies charge a fee only when they have had to impound a vehicle, and the Juarezes' vehicle had not been impounded Two months later, Wolter revised her deposition testimony to state that the local law enforcement fee in the Juarezes' case was $15, and altered her statement about when a law enforcement agency charges a fee to add, "If it is impounded . . . for whatever reason or repossessed." The $784.50 Wolter had calculated during her deposition as the full payment amount did not include the $15 law enforcement fee.

In its summary judgment motion, Arcadia asserted that at the time the Juarezes' NOI was generated,[5] the Juarezes could have reinstated their contract for $784.50. However, this figure did not include the law enforcement fee. Arcadia argued that although the Juarezes had sent Arcadia $784.50, Arcadia did not receive the money until after another installment payment of $371.92 had come due, and another late fee of $18.59 had been assessed. In its responses to interrogatories, Arcadia identified an additional fee that the Juarezes apparently also owed—$75.00 for "repossession expenses (transportation fee to the auction)."

B. *Procedural background*

The Juarezes initially filed an individual action against Arcadia for conversion and related claims. On September 16, 2004, the Juarezes amended their complaint to add class claims pursuant to the UCL, as set forth in Business and Professions Code section 17200 et seq.

The Juarezes alleged that Arcadia had violated the UCL by engaging in unlawful, unfair and fraudulent business practices with regard to the NOI it sent to buyers after repossessing their vehicles. Specifically, the Juarezes alleged that Arcadia's NOI was unlawful because it failed to meet the requirements of the Act in that it did not adequately inform buyers as to the conditions precedent to reinstatement of their contracts. The Juarezes further alleged that Arcadia's practices with regard to the NOI were fraudulent and unfair, in that Arcadia suggests to buyers that they can reinstate their contracts if they use the numbers provided in the redemption section of the NOI to calculate what they owe for reinstatement, but fails to inform the buyer that there may be additional fees, such as a law enforcement fee, that the buyer must pay in order to reinstate a contract.

On April 29, 2005, the trial court certified a class in the Juarezes' action. The class was defined as "all California [buyers] to whom Arcadia sent post-repossession Notices that did not include the specific figure necessary to cure the default dated November 1, 2002 through the present date, and against whom Arcadia sought a deficiency at any time, or who made post-repossession payments to Arcadia." The class excluded those individuals who had redeemed their vehicles or whose contracts had been reinstated.

On December 28, 2005, the trial court denied the Juarezes' motion to compel Arcadia to provide information regarding the profits it made as a result of deficiency payments it obtained from class members.

In late 2005, Arcadia moved for summary adjudication of the class claims. Arcadia argued that Rees-Levering does not require that an NOI set forth the

---

[5] The date of the notice and the date it was mailed were different.

amounts necessary to reinstate a contract, and that its statement of what the buyer would have to do to reinstate was sufficient under the Act.

The trial court granted Arcadia's motion for summary adjudication of the class claims on March 17, 2006. The Juarezes appeal from the court's order granting summary adjudication of the class claims, and seek review of that order as well as the trial court's order denying the Juarezes' motion to compel Arcadia to disclose the profits it made from funds paid to Arcadia by class members. On August 30, 2006, the trial court filed its final judgment on the class claims.[6]

## III.

## DISCUSSION

### A. *Summary judgment on the class claims was not proper*

The parties agree that the issue in this appeal is whether an NOI must state the specific amount a buyer must pay for reinstatement in order to comply with section 2983.2, subdivision (a)(2). The relevant statutory language provides that the NOI must "[s]tate[] either that there is a conditional right to reinstate the contract until the expiration of 15 days from the date of giving or mailing the notice *and all the conditions precedent thereto* or that there is no right of reinstatement and provide[] a statement of reasons therefor." (§ 2983.2, subd. (a)(2), italics added.)

The Juarezes contend that the notices Arcadia sends to defaulting buyers do not provide adequate information about the conditions precedent to reinstatement because the NOI's fail to inform buyers of the amounts they must pay to reinstate their contracts. Arcadia contends that Rees-Levering requires that it provide "only a general statement of the acts or events that must occur before the contract is reinstated." We conclude that in requiring creditors to state "all the conditions precedent" to reinstatement, the Legislature intended that creditors provide sufficient information to defaulting buyers to enable them to determine precisely what they must do in order to reinstate their contracts, including stating the amounts due, to whom they are due, the addresses and/or contact information for those parties, and any other specific actions the buyer must take.

---

[6] The trial court entered a final judgment as to the class claims after the Juarezes filed their notice of appeal from the order granting summary judgment on the class claims. We exercise our discretion and treat the notice of appeal as having been filed immediately after entry of judgment. (Cal. Rules of Court, rule 8.104(e)(2) ["The reviewing court may treat a notice of appeal filed after the superior court has announced its intended ruling, but before it has rendered judgment, as filed immediately after entry of judgment"].)

### 1. *Legal standards*

We review de novo the trial court's interpretation of section 2983.2, subdivision (a)(2). (See *Kavanaugh v. West Sonoma County Union High School Dist.* (2003) 29 Cal.4th 911, 916 [129 Cal.Rptr.2d 811, 62 P.3d 54].)

■ In construing any statute, "[w]ell-established rules of statutory construction require us to ascertain the intent of the enacting legislative body so that we may adopt the construction that best effectuates the purpose of the law. [Citation.] We first examine the words themselves because the statutory language is generally the most reliable indicator of legislative intent. [Citation.] The words of the statute should be given their ordinary and usual meaning and should be construed in their statutory context. [Citations.] These canons generally preclude judicial construction that renders part of the statute 'meaningless or inoperative.' [Citation.]" (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715–716 [3 Cal.Rptr.3d 623, 74 P.3d 726].)

■ "The language is construed in the context of the statute as a whole and the overall statutory scheme, so that we give ' "significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose." ' [Citation.] 'Literal construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. [Citations.] An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to two alternative interpretations, the one that leads to the more reasonable result will be followed [citation].' [Citation.]" (*In re Ogea* (2004) 121 Cal.App.4th 974, 980–981 [17 Cal.Rptr.3d 698].)

■ Where the language of a statute is clear and unambiguous, we follow the plain meaning of the statute, and need not examine other indicia of legislative intent. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If language in a statute is ambiguous, "we must determine its meaning and scope. [Citation.] In doing so, we may look to 'extrinsic sources, including the ostensible objects to be achieved . . . . In such situations, we strive to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statutes' general purposes. . . . [Citation.]' [Citation.]" (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1130 [13 Cal.Rptr.3d 616].)

2. *Interpreting section 2983.2, subdivision (a)(2) to require that Arcadia provide specific information about "all the conditions precedent" to reinstatement is more consistent with the legislative purpose of the Act than is the interpretation Arcadia advances*

The trial court concluded that Arcadia's NOI comports with the statutory requirement that Arcadia inform the buyer of "all the conditions precedent" to exercising the right to reinstate the contract. Arcadia's NOI provides: "You may reinstate the contract within 20 days of the date of this notice under the following conditions: [¶] Payment of all past due installments, late payment penalties, repossession costs, resale expenses and storage fees (if any), and payment of repossession fee to local law enforcement agency." The NOI provides no further information about how the buyer can reinstate his or her contract. As the trial court noted, it is undisputed that Arcadia does not include any specific dollar amounts in the reinstatement section of the NOI that would inform buyers as to how much they must pay in order to reinstate their contracts.

Construing the words in the context of the statutory scheme as whole, we conclude that Arcadia's NOI does not meet the requirements of Rees-Levering.

a. *Rees-Levering is a buyer protection act*

"The legislative purpose in enacting the Rees-Levering Act was to provide more comprehensive protection for the unsophisticated motor vehicle [buyer]." (*Cerra v. Blackstone* (1985) 172 Cal.App.3d 604, 608 [218 Cal.Rptr. 15] (*Cerra*), citing the Final Rep. of the Assem. Interim Com. on Finance and Insurance, 15 Assem. Interim Com. Reps. No. 24 (1961 Reg. Sess.) as quoted in *The Rees-Levering Motor Vehicle Sales and Finance Act* (1962) 10 UCLA L.Rev. 125, 127.) To support this purpose, the Legislature provides a defaulting buyer the right to reinstate his or her contract, subject to certain exceptions: "If after default by the buyer, the seller . . . repossesses . . . the motor vehicle, any person liable on the contract shall have a right to reinstate the contract . . . ." (§ 2983.3, subd. (b).)

Section 2983.2, subdivision (a) details the information creditors must provide to buyers in the NOI. Subdivision (a) provides in part:

"Except where the motor vehicle has been seized as described in paragraph (6) of subdivision (b) of Section 2983.3, any provision in any conditional sale contract for the sale of a motor vehicle to the contrary notwithstanding, at least 15 days' written notice of intent to dispose of a repossessed or surrendered motor vehicle shall be given to all persons liable on the contract.

The notice shall be personally served or shall be sent by certified mail, return receipt requested, or first-class mail, postage prepaid, directed to the last known address of the persons liable on the contract. If those persons are married to each other, and, according to the most recent records of the seller or holder of the contract, reside at the same address, one notice addressed to both persons at that address is sufficient. Except as otherwise provided in Section 2983.8, those persons shall be liable for any deficiency after disposition of the repossessed or surrendered motor vehicle only if the notice prescribed by this section is given within 60 days of repossession or surrender and does all of the following:

"(1) Sets forth that those persons shall have a right to redeem the motor vehicle by paying in full the indebtedness evidenced by the contract until the expiration of 15 days from the date of giving or mailing the notice and provides an itemization of the contract balance and of any delinquency, collection or repossession costs and fees and sets forth the computation or estimate of the amount of any credit for unearned finance charges or canceled insurance as of the date of the notice.

"(2) States either that there is a conditional right to reinstate the contract until the expiration of 15 days from the date of giving or mailing the notice and all the conditions precedent thereto or that there is no right of reinstatement and provides a statement of reasons therefor.

"(3) States that, upon written request, the seller or holder shall extend for an additional 10 days the redemption period or, if entitled to the conditional right of reinstatement, both the redemption and reinstatement periods. The seller or holder shall provide the proper form for applying for the extensions with the substance of the form being limited to the extension request, spaces for the requesting party to sign and date the form, and instructions that it must be personally served or sent by certified or registered mail, return receipt requested, to a person or office and address designated by the seller or holder and received before the expiration of the initial redemption and reinstatement periods.

"(4) Discloses the place at which the motor vehicle will be returned to those persons upon redemption or reinstatement.

"(5) Designates the name and address of the person or office to whom payment shall be made.

"(6) States the seller's or holder's intent to dispose of the motor vehicle upon the expiration of 15 days from the date of giving or mailing the notice, or if by mail and either the place of deposit in the mail or the place of address

is outside of this state, the period shall be 20 days instead of 15 days, and further, that upon written request to extend the redemption period and any applicable reinstatement period for 10 days, the seller or holder shall without further notice extend the period accordingly."

### b. The phrase "all the conditions precedent" is ambiguous with regard to the level of specificity required in the NOI

The phrase "all the conditions precedent" does not, in itself, provide insight as to precisely what information regarding reinstatement the Legislature intended that creditors be required to provide in the NOI. Black's Law Dictionary defines a "condition precedent" as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." (Black's Law Dict. (8th ed. 2004) p. 312, col. 2.) Arcadia suggests that the Legislature's use of the phrase "conditions precedent," suggests that it intended to require only a very general, basic description of the acts a defaulting buyer must perform in order to reinstate the contract. Arcadia derives its theory from the fact that the statute requires that the NOI include the "conditions" of reinstatement, and does not require that the NOI state the "amounts" required for reinstatement. Arcadia further contends that the phrase "conditions precedent" refers to "acts or events" and not to "numbers, amounts, sums or totals." Arcadia asserts that because the Legislature used the word "conditions," and did not use the word "amounts," it must not have intended that NOI's provide buyers any information beyond the general categories of actions that the buyer must take, and that the Legislature did not intend that NOI's provide buyers with the specific dollar amounts they must pay to reinstate their contracts.

Arcadia's argument on this point is not persuasive. The requirement that the NOI set forth the "all the conditions precedent" to reinstatement does not imply anything about whether there is or is not a requirement that the NOI provide "numbers, amounts, sums or totals" with regard to reinstatement. It is possible to describe a "condition precedent" in a manner that involves references to numbers, amounts, and sums, or instead to describe the condition more generally, as any generic type of act or event that must occur prior to the fulfillment of a promise or duty. For example, a statement that the buyer must "pay a late penalty fee of $15.00" to reinstate a contract is as much a description of an act that is required of a defaulting buyer to reinstate his or her contract as is the statement that the buyer must "pay a late penalty fee." Thus, two different descriptions of a condition precedent can refer to the same act, but one may be more specific than the other.

The fact that the Legislature used the phrase "all the conditions precedent" reveals nothing about the level of specificity the Legislature intended that

NOI's provide in describing those conditions. The phrase is thus ambiguous. The question this ambiguity raises is what level of specificity the Legislature intended that creditors be required to provide to defaulting buyers when notifying them of "all the conditions precedent" to reinstatement of their contracts. For the reasons we discuss in the following section, we conclude that the Legislature intended to require more specificity than Arcadia's notices provide.

c. *The most reasonable interpretation of the phrase "all the conditions precedent" is that it requires creditors to provide enough information to allow buyers to determine precisely what they must do in order to reinstate their contracts*

In interpreting the meaning of the phrase "all the conditions precedent" as used in Rees-Levering, we begin with the rule that when more than one construction is possible, courts should favor the construction that best supports the purposes sought to be achieved by the statute: " 'Taking into consideration the policies and purposes of the act, the applicable rule of statutory construction is that the purpose sought to be achieved and evils to be eliminated have an important place in ascertaining the legislative intent. [Citation.] Statutes should be interpreted to promote rather than defeat the legislative purpose and policy. [Citation.] "[I]n the interpretation of statutes, when two constructions appear possible, this court follows the rule of favoring that which leads to the more reasonable result." [Citation.] . . . "That construction of a statute should be avoided which affords an opportunity to evade the act, and that construction is favored which would defeat subterfuges, expediencies, or evasions employed to continue the mischief sought to be remedied by the statute, or to defeat compliance with its terms, or any attempt to accomplish by indirection what the statute forbids." ' " (*Cerra, supra,* 172 Cal.App.3d at p. 608, quoting *Freedland v. Greco* (1955) 45 Cal.2d 462, 467 [289 P.2d 463].)

Reading the phrase "all the conditions precedent" in subdivision (a)(2) of section 2983.2 in the context of the overall statutory scheme, and considering the Legislature's purpose in enacting Rees-Levering, it seems clear that the Legislature intended that the NOI provide a level of specificity as to the conditions precedent to reinstatement sufficient to inform the buyer—without need for further inquiry—as to exactly what the buyer must do to cure the default. Thus, the statute requires that a creditor inform the consumer of any amounts the buyer must pay to the creditor and/or to third parties, and provide the buyer with the names and addresses of those

who are to be paid.[7] The creditor must also inform the consumer regarding any additional monthly payments that will come due before the end of the notice period, as well as of any late fees, or other fees, the amount(s) of these additional payments or fees, and when the additional sums will become due. If the creditor does not provide the defaulting buyer with this information, the creditor has not informed the defaulting buyer of "all the conditions precedent" to reinstatement of the contract.

This interpretation is more reasonable than the interpretation Arcadia offers. The general description Arcadia provides in its notice regarding the types of things a defaulting buyer must do to reinstate a contract serves to frustrate the purpose of Rees-Levering, not to promote it. Under Arcadia's interpretation, the burden is on the buyer to gather sufficient accurate information as to how he or she can fulfill the conditions of reinstatement. Considering that Arcadia has in its possession the relevant information the defaulting buyer needs in order to reinstate a contract, requiring the buyer to obtain this information by contacting Arcadia and/or by gleaning it from other sources places a significantly greater burden on the buyer than any burden that would be placed on Arcadia from requiring that it disclose this information to defaulting buyers in writing at the beginning of the process.

The burden that Arcadia's NOI places on the buyer makes it more difficult for a buyer to exercise the right to reinstate, and reduces the amount of time the consumer has to fulfill the conditions by requiring that the consumer spend time tracking down the relevant information. In view of the fact that the Legislature required that creditors notify defaulting buyers of "all the conditions precedent" (§ 2983.2, subd. (a)(2)) to reinstatement in an effort to "provide more comprehensive protection for the unsophisticated motor vehicle consumer" (*Cerra, supra,* 172 Cal.App.3d at p. 608), it would be unreasonable to conclude that the Legislature intended that such a burden be placed on buyers.

The Juarezes' situation is a perfect example of how Arcadia's interpretation serves to frustrate the goals of Rees-Levering. The NOI that Arcadia sent the Juarezes informed them that in order to reinstate their contract, they would have to pay Arcadia "all past due installments, late payment penalties, repossession costs, resale expenses and storage fees (if any), and [a] repossession fee to [a] local law enforcement agency." This information was essentially meaningless to the Juarezes in the absence of additional, more specific information. When faced with an NOI that gave them virtually no useful information as to what they would have to do to have their contract

---

[7] Section 2983.2, subdivision (a)(5) requires that the NOI "[d]esignate[] the name and address of the person or office to whom payment shall be made."

reinstated, the Juarezes attempted to ascertain the dollar amount necessary for reinstatement, based on other information contained in the NOI. After sending Arcadia this estimated amount, the Juarezes waited to hear from Arcadia. When they did not hear from Arcadia, they called to inquire about the status of the reinstatement. Their call was not returned for nearly a week. When a representative from Arcadia finally did call the Juarezes, the representative informed them that they would have to pay more money than the amount they had sent to Arcadia because another payment date had passed. The representative failed to tell the Juarezes about the local law enforcement fee. All of this impeded the Juarezes' ability to reinstate their contract.

By providing buyers like the Juarezes incomplete information as to what they must do to have their contracts reinstated, and thus requiring buyers to inquire of Arcadia as to what they must do to reinstate, Arcadia not only makes it more difficult for buyers to reinstate their contract, but also effectively reduces the time the Act provides to buyers to remedy any defaults. Under Arcadia's interpretation of the statute, an unscrupulous creditor could take advantage of this situation by simply evading a buyer's requests for the necessary information.[8] Arcadia's interpretation would have the effect, whether intended or not, of shortening the statutory time period for reinstatement—a result that directly conflicts with the explicit timeframes the Legislature provided in subdivision (a) paragraphs (2) and (6) of section 2983.2. Because we must "give 'significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose' " (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 [14 Cal.Rptr.3d 1, 90 P.3d 1168]), we should avoid adopting an interpretation of the phrase "all the conditions precedent" that has the effect of shortening or possibly nullifying the statutory time periods set forth in the Act.

---

[8] The Juarezes did not receive a call back from Arcadia about the NOI until approximately six days after they called to inquire. In addition, the NOI that was sent to the Juarezes was not postmarked until at least four days after the date printed on the NOI. Further, although the statute provides that the Juarezes were to have 20 days after the date of "giving or mailing" the notice to redeem or reinstate, the NOI erroneously informed the Juarezes that they had to redeem or reinstate "within 20 days of the date of this notice."

If Arcadia had a practice of not mailing the NOI on the *same* date identified as the date printed on the NOI, then Arcadia's telling buyers that the time period commenced on the date of the NOI was an inaccurate statement of the law, and misled buyers about how much time they had to remedy the default. Some buyers might have forgone the opportunity to redeem their vehicles or reinstate their contracts because they believed they would not be able to fulfill the conditions until after the time period stated in the NOI had elapsed. Further, if Arcadia relied on the date stated in the NOI, and not the date of mailing, in determining when it could lawfully dispose of a repossessed vehicle, Arcadia may have disposed of vehicles without giving buyers the required number of days to remedy any default.

Arcadia's interpretation is unreasonable for another reason as well. Under its interpretation, a creditor would *never* be required to inform the buyer of any of the amounts he or she must pay in order to reinstate the contract, *even if* the buyer called or wrote to inquire about this information. This is because the only requirement Rees-Levering imposes on creditors concerning their duty to notify a buyer about reinstating his or her contract is the notice requirement found in section 2983.2, subdivision (b), which requires notification of "all the conditions precedent." There is nothing in the statute that requires the creditor to provide the buyer with other information regarding reinstatement at any point after it has notified the buyer through the NOI. Under Arcadia's interpretation of the statute, the phrase "all the conditions precedent" as used in section 2983.2, subdivision (b), would require only that the creditor provide the buyer with the most general information as to what the buyer must do to reinstate the contract. If general information were all that is required under section 2983.2, subdivision (b), then a buyer would never have the right to be told precisely how much he or she must pay in order to reinstate the contract. Without this specific information, a buyer would not be able to exercise the right of reinstatement. Thus, under Arcadia's interpretation of the Act, the defaulting buyer's ability to reinstate is left to the discretion of the creditor, who will be in the position of deciding whether to provide a buyer the specific information necessary to allow him or her to reinstate. Such a result would clearly conflict with the statutory scheme as a whole. It would be unreasonable to conclude that the Legislature intended that buyers not be provided sufficient information to be able to exercise their rights under the statute. Since section 2983.2, subdivision (a)(2) is the only provision that requires creditors to provide information to the buyer, the most reasonable interpretation of that provision is that it requires creditors to provide notice sufficient to allow the buyer to exercise the right to reinstate. (See *Freedland v. Greco, supra,* 45 Cal.2d at p. 468 [" 'That construction of a statute should be avoided which affords an opportunity to evade the act, and that construction is favored which would defeat subterfuges, expediencies, or evasions employed to continue the mischief sought to be remedied by the statute, or to defeat compliance with its terms, or any attempt to accomplish by indirection what the statute forbids' "].)[9]

We find support for our view in *Cerra, supra,* 172 Cal.App.3d 604. The trial court rejected *Cerra* as supporting the Juarezes' position because the *Cerra* court "was not required to and did not decide whether an NOI must

---

[9] At oral argument, counsel for Arcadia stated that the industry (i.e., creditors under conditional sales contracts for vehicles) prefers to reinstate contracts over having to seek deficiency judgments against defaulting buyers. If this is the case, the industry should have little quarrel with our interpretation of the statute, since it is more likely to result in reinstatements than is Arcadia's proffered interpretation.

state the amount necessary to reinstate the contract." It is true, as the trial court observed, that the *Cerra* court was not considering the level of specificity required by the use of the phrase "all the conditions precedent" in subdivision (a)(2) of section 2983.2. Rather, the issue in *Cerra* was whether a defaulting buyer has a claim for conversion if the creditor gave insufficient notice or denied the right of reinstatement. (*Cerra, supra*, 172 Cal.App.3d at p. 608.) The *Cerra* court concluded that a defaulting buyer who is not provided with proper notice of his right to reinstate the contract may bring an action for conversion against the creditor who repossessed the car. (*Id.* at pp. 608–609.) The *Cerra* court observed that the notice that was provided in that case "did not even come close to complying with Civil Code section 2983.2" (*Cerra, supra*, 172 Cal.App.3d at p. 606), and suggested that proper notice under section 2983.2 would include the dollar amount necessary for reinstatement.

The *Cerra* court first summarized the notice required under that provision: "The notice required to be given pursuant to section 2983.2 details the buyer's rights and the sum necessary to cure the default." (*Cerra, supra*, 172 Cal.App.3d at p. 608.) The court later reiterated its concern with the creditor's failure to provide the defaulting buyer with the dollar amount required for reinstatement: "It is true that the declarations filed on behalf of Cerra do not show that he or his agents had tendered the required repossession costs, but he can hardly be faulted when he was not advised of his rights pursuant to section 2983.2 or of the amount needed to obtain reinstatement." (*Cerra, supra*, at p. 609.) The *Cerra* court thus clearly interpreted the phrase "all the conditions precedent" to include notice of the specific *dollar amounts* necessary to reinstate the contract.

Arcadia argues that the Legislature could not have intended that creditors be required to provide buyers with dollar amounts the buyer must pay to reinstate the contract because there are some situations in which the creditor will not know the amounts a buyer must pay to reinstate the contract. Arcadia cites as examples situations in which the default arises as a result of the buyer's failure to keep the car free from encumbrances and liens, or as a result of the buyer's failure to maintain insurance for the car. According to Arcadia, in a situation that involves a buyer's failure to keep the car free from encumbrances and liens, the creditor will not know how much the buyer owes to a third party or parties. Similarly, Arcadia maintains that in a situation that involves a lack of insurance, the creditor will not know how much the buyer must pay for insurance.

■ We acknowledge that there may be instances in which the creditor does not possess information about the amount a buyer must pay to a

third party in order to satisfy a condition precedent to reinstatement.[10] However, the fact that there may be some instances in which the creditor does not know the amount the defaulting buyer must pay to another party does not mean that creditors need not provide information about the amounts owed to the creditor or to third parties when the creditor *does* (or reasonably should) know those amounts. The creditor must provide the buyer with *all* of the relevant information it possesses and/or information it has the ability to discern, concerning precisely what the buyer must do to reinstate his or her contract.

The fact that there are a variety of possible conditions precedent to reinstatement, some of which may not involve the payment of money to the creditor, supports our interpretation of the statute. It would not have been practical for the Legislature to have attempted to craft a provision that specified *all* potential conditions precedent that might be imposed on a defaulting buyer. Rather than try to anticipate any and all such conditions a creditor might impose before allowing reinstatement, the Legislature used the phrase "all the conditions precedent" to cover the entire field.

Arcadia urges us to adopt its interpretation of the words "conditions precedent," by arguing that other provisions in Rees-Levering specify exactly what information the creditor must provide to the buyer, while this provision does not. Arcadia contrasts subdivision (a)(2) of section 2983.2 with subdivision (a)(1) and (7) of the same section. Subdivision (a)(1), which pertains to redemption, requires that the NOI "provide[] an itemization of the contract balance and of any delinquency, collection or repossession costs and fees and set[] forth the computation or estimate of the amount of any credit for unearned finance charges or canceled insurance as of the date of the notice." (§ 2983.2, subd. (a)(1).) Subdivision (a)(7) requires that the NOI inform buyers that on written request the creditor "will furnish a written accounting regarding the disposition of the motor vehicle as provided for in subdivision (b)." (§ 2983.2, subd. (a)(7).)

Contending that " '[w]here the same word or phrase might have been used in the same connection in different portions of a statute but a different word or phrase having different meaning is used instead, the construction employing that different meaning is to be favored' " (*Kray Cabling Co. v. County of Contra Costa* (1995) 39 Cal.App.4th 1588, 1593 [46 Cal.Rptr.2d 674]), Arcadia asserts that the "different wording of these neighboring provisions shows that the Legislature chose not to require NOI's to set forth the amount the customer must pay to reinstate." We disagree. The difference in the

---

[10] There were comments made at oral argument to the effect that a creditor who retains title to the vehicle pursuant to a conditional sales contract will often, if not always, know the dollar amount required to have a lien released.

wording used in the various sections of the Act is a function of the fact that these sections describe very different things. Unlike the situation in which a defaulting buyer seeks to redeem the vehicle, which requires *only* the payment of money, reinstatement might require that the defaulting buyer do things other than, or in addition to, paying money to the creditor and/or a third party. It would therefore make sense for the Legislature to require an itemization of the costs required to redeem a vehicle under subdivision (a)(1) of section 2983.2, since redemption will require the payment of these sums in every instance. This also explains why the Legislature would use the word "accounting" in subdivision (a)(7), which deals with providing the defaulting buyer with the details of the proceeds and expenses related to the disposition of the repossessed vehicle. In each instance in which the creditor disposes of a vehicle, the issues involve *only* money—i.e., whether there remains any liability or whether the defaulting buyer is entitled to any surplus remaining after all debts have been satisfied. (See § 2983.2, subd. (b).)

In contrast, the conditions precedent to reinstatement can involve things other than simply paying money to the creditor, as illustrated by defaults arising from the failure to keep the vehicle free from liens or encumbrances or the failure to maintain insurance. Thus, the Legislature used the phrase "all the conditions precedent"—a more expansive term than either "itemization" or "accounting"—when discussing what must be included in the notice that creditors are required to provide to defaulting buyers about their right to reinstate. This makes sense considering the variety of conditions that a creditor might impose before allowing a defaulting buyer to reinstate the contract.

We disagree with Arcadia's argument that "[d]isclosure of various different reinstatement amounts due at different times might prove confusing to the buyer and burdensome to the creditor." The creditor knows, or should know, how much the buyer owes, when the buyer owes it, and why the amount is owed (i.e., under what provision of the contract the assessment is being charged). Requiring the creditor to provide this information to the buyer thus should not impose an undue burden on the creditor.[11] According to Arcadia, "it is difficult to disclose reinstatement amounts in a clear, concise manner in an NOI even when the creditor knows those sums" because the amounts might change if the defaulting buyer misses another payment. However, this difficulty would exist regardless of whether the creditor is preparing an NOI or talking with a buyer on the telephone, since the possibility that the reinstatement amounts could change if reinstatement does not occur by a certain date is just as true for a buyer who calls the creditor to ask for

---

[11] Arcadia acknowledges that it will provide this information to the buyer at some point in time when it suggests that the buyer call the creditor after receiving the NOI to obtain this relevant information over the telephone.

more details about how to reinstate his or her contract as it is for a buyer who receives an NOI. Arcadia appears to agree that it is reasonable to expect the creditor's telephone representative to alert the buyer to the fact that another payment may be due before the buyer can fulfill all of the other conditions precedent, and to inform the buyer that late penalties will apply if that payment is not received by a certain date. There is no reason why the NOI cannot do the same.

Although Arcadia asserts otherwise, there is no reason to believe a buyer is likely to be confused by a notice that informs the buyer that if he or she wishes to reinstate the contract, he or she must pay a certain sum by a certain date, and that if the payment is not made by that date, he or she will have to pay additional sums. In fact, in its briefing Arcadia demonstrates that it would not be difficult to explain to the defaulting buyer that the amount required to reinstate might increase over time. Arcadia explains that in a case in which a buyer fails to make the next monthly payment prior to paying the amounts required for reinstatement, "[t]he reinstatement amount increases by the amount of the missed payment on its due date, by the amount of the late payment fee ten days later, and by an additional $15 on another date if the buyer's check is returned unpaid."[12] This explanation, together with the specific information as to the amount due in the next installment and when that amount is due, would be sufficient to alert the buyer not only that the amount necessary for reinstatement might increase, but also when it will increase and by how much. Contrary to Arcadia's suggestion otherwise, this approach seems much *less* likely to confuse the buyer than the method Arcadia has been employing, which is to not inform the buyer at all about how much he or she owes at any particular time.

We do not find persuasive Arcadia's complaint that requiring "new additional disclosures" will make compliance immeasurably more difficult for creditors. The disclosures that we conclude must be included in the NOI are neither "new" nor "additional." Rather, this is information that must be disclosed to the buyer at some point in time, as Arcadia implicitly concedes by saying that the Legislature intended that buyers call creditors in order to find out the amount they must pay to reinstate. Arcadia thus also concedes that it possesses this information and that it must disclose the information to the buyer at some point if the defaulting buyer is to be able to reinstate.

---

[12] Arcadia is referring to provisions of the Act that limit the fees a creditor may charge. (See § 2982, subds. (k) [allowing creditors to include in a contract a delinquency fee of up to 5 percent of the delinquent installment after the installment is delinquent for more than 10 days], (p) [allowing creditors to impose no more than a $15 fee for returned checks so long as the contract so provides].)

■ We therefore hold that under Rees-Levering, an NOI must inform the buyer of any amounts the buyer will have to pay to the creditor and/or to a third party to reinstate a contract. The NOI must also inform the buyer if, when, and by how much those amounts may increase as a result of additional payments coming due, or as a result of late fees or other fees and charges. In other words, creditors must provide buyers with sufficient information to allow buyers to fulfill all of the conditions the buyer must meet before a creditor will reinstate the contract. Arcadia's NOI does not satisfy these requirements.

The trial court ruled that the class could not prevail on its UCL claims against Arcadia after it determined that Arcadia's NOI complied with the requirements of Rees-Levering. Because we conclude that Arcadia's NOI is insufficient under Rees-Levering, we reverse the trial court's grant of summary judgment in favor of Arcadia on the class UCL claims.[13]

B. *The information that the interrogatories request is sufficiently relevant for discovery purposes*

The Juarezes contend that the trial court erred in denying their motion to compel Arcadia to provide information about any profits it made from use of the money it received from plaintiffs for "invalid deficiency claims." The three interrogatories at issue asked Arcadia (1) whether it "maintain[s] in a separate account the funds it collected from the Class Members"; (2) if it does so, whether Arcadia earned any profits on those funds; and (3) if Arcadia instead commingled the funds with general funds, what was its return on equity (which, the Juarezes maintain, is the standard measure of corporate profits). The trial court determined that the information plaintiffs sought was not relevant to the action because plaintiffs "can be restored to the status quo ante by ordering defendant to refund whatever amounts the class was improperly induced to pay out."

The scope of discovery is intended to be very broad: "[A]ny party may obtain discovery regarding any matter, not privileged, that is relevant to the subject matter involved in the pending action or to the determination of any motion made in that action, if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible

---

[13] The trial court's ruling that, as a matter of law, Arcadia's practice does not violate the UCL's prohibition against "unlawful" business practices can no longer stand. Because the court premised its rulings concerning the "unfair" and "deceptive" prongs of the UCL rulings in part on its erroneous analysis as to why Arcadia's practice did not violate Rees-Levering, our conclusion regarding Rees-Levering's notice requirements implicates those rulings as well. On remand, the trial court should consider the Juarezes' claims under all three prongs of the UCL.

evidence. Discovery may relate to the claim or defense of the party seeking discovery or of any other party to the action." (Code Civ. Proc., § 2017.010.)

■ Business and Professions Code section 17203 permits "any· court of competent jurisdiction" to enjoin "[a]ny person who engages, has engaged, or proposes to engage in unfair competition . . . ." Section 17203 also authorizes courts to make such orders as " 'may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.' " "The purpose of such orders is 'to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains.' [Citations.]" (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

The Juarezes contend that the information they seek to discover is relevant because it may lead to evidence that would assist the court in "mak[ing] such orders or judgments . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition [as prohibited by the UCL]." (Bus. & Prof. Code, § 17203.) Arcadia asserts that the proposed discovery is irrelevant because a "plaintiff may not recover the defendant's profits under the UCL."

■ The court reached its conclusion that the information the Juarezes sought was not relevant by relying on the following language in *Day v. AT & T Corp.* (1998) 63 Cal.App.4th 325, 338–339 [74 Cal.Rptr.2d 55] (*Day*): "Taken in the context of the statutory scheme, the definition suggests that [Business and Professions Code] section 17203 operates only to return to a person those *measurable amounts* which are *wrongfully taken* by means of an unfair business practice. The intent of the section is to make whole, equitably, the victim of an unfair practice."[14] However, the *Day* court was concerned with the fact that the representative plaintiff was seeking the

---

[14] The *Day* court's, and other courts', discussions about using restitution to make victims "whole" in the context of a UCL action contain reasoning that is similar to the reasons a plaintiff may be awarded damages. For example, in discussing the remedial provisions in ERISA (Employee Retirement Income Security Act of 1974) (29 U.S.C. § 1001 et seq.) in *Mertens v. Hewitt Associates* (1993) 508 U.S. 248, 252 [124 L.Ed.2d 161, 113 S.Ct. 2063], the United States Supreme Court commented on the distinctions between different remedies, including damages and restitution: "Section 409(a), 29 U.S.C. § 1109(a), makes fiduciaries liable for breach of these duties, and specifies the remedies available against them: The fiduciary is personally liable for damages ('*to make good to [the] plan any losses to the plan resulting from each such breach*'), for restitution ('to restore to [the] plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary'), and for 'such other equitable or remedial relief as the court may deem appropriate,' including removal of the fiduciary." (Italics added.) Thus, although the UCL has been interpreted to permit relief in the form of restitution, but not damages, the concept of restitution that courts have applied

disgorgement of profits into a fluid recovery fund despite the fact that the public had not suffered a measurable loss as a result of the defendant's conduct: "Even in those cases which have allowed for a fluid recovery, as opposed to a restoration to identified individuals or classes, the amount being restored has been objectively measurable as that amount which the defendant would not have received but for the unfairly competitive practice. [Citations.] [¶] . . . If the court were to fashion a fluid recovery in this case, how would *the amount be measured? What have respondents obtained which they are not entitled to keep?* Appellants assert that the court could, if it chose to, order respondents to disgorge all the money earned from phone card sales, because if they had not advertised misleadingly, members of the public would not have purchased the cards at all. The fact remains, however, that once the cards were purchased and used, the members of the public received exactly what they paid for. The filed tariffs allow the practice of rounding up, so that a card lasts only as long as the number of full minute units debited, regardless of actual 'talk time.' This appellants do not dispute. They make clear, in fact, *that they are not attacking the practice of rounding up,* as to do so would trigger the application of the filed rate doctrine. That said, *there are no ill-gotten profits to restore.* Any amount taken away from respondents for services provided using properly filed tariffs would amount to a rebate. This, as we have seen, is not permitted. [¶] To summarize, the notion of restoring something to a victim of unfair competition includes two separate components. *The offending party must have obtained something to which it was not entitled and the victim must have given up something which he or she was entitled to keep.*" (*Day, supra,* 63 Cal.App.4th at pp. 339–340, italics altered.)

The situation in this case differs from that in *Day* in significant respects. First, unlike in *Day,* in this case there is a certified class, which means that a fluid recovery fund is possible pursuant to the class action statute, despite not being available under the UCL. (See *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 137 [96 Cal.Rptr.2d 485, 999 P.2d 718] ["In sum, the Legislature has not expressly authorized monetary relief other than restitution in UCL actions, but has authorized disgorgement into a fluid recovery fund in class actions"].)

 Second and more important, in this case the plaintiff class is alleged to have suffered a measurable loss. Thus, if plaintiffs succeed in establishing UCL liability, it will be clear that Arcadia obtained something to which it was not entitled, and that the plaintiff class gave up something its members were entitled to keep. In *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149 [131 Cal.Rptr.2d 29, 63 P.3d 937] (*Korea Supply*), the Supreme Court concluded that "restitutionary disgorgement" is available

in the UCL context appears to bear some relationship to the historical function of "damages," rather than the historical function of "restitution."

under the UCL. This may include monies that were not necessarily in the plaintiff's possession: "We have stated that '[t]he concept of restoration or restitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person.' [Citation.] Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest." (*Korea Supply, supra*, 29 Cal.4th at p. 1149, citing *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 178 [96 Cal.Rptr.2d 518, 999 P.2d 706].)

■ The acknowledgement in *Korea Supply* that the concept of restitution is broader than simply the return of money that was once in the possession of the person from whom it was taken is not surprising. The basic premise of this type of remedy is that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." (Rest., Restitution, § 1.) "Ordinarily, the measure of restitution is the amount of enrichment received . . ., but as stated in Comment *e*, if the loss suffered differs from the amount of benefit received, *the measure of restitution may be more or less than the loss suffered or more or less than the enrichment.*" (*Id.* at § 1, com. a, p. 12, italics added.)[15]

In this case, plaintiffs arguably have an ownership interest in any profits Arcadia may have gained through interest or earnings on plaintiffs' money that Arcadia wrongfully held. This case is distinguishable from the cases Arcadia cites for the proposition that "[e]very case that has considered the issue has denied recovery of defendant's profits under the UCL," because in none of those cases did the plaintiff or plaintiffs establish a measurable loss or a vested interest in the profits to be disgorged. Arcadia cites *Korea Supply, supra,* 29 Cal.4th at page 1149, in support of its position. In *Korea Supply,* the plaintiff sought disgorgement of profits from the defendant, a competitor of the plaintiff's who had been awarded a contract from the Korean government as to which both the plaintiff and defendant had offered bids. (*Id.* at p. 1140.) After the Korean government awarded the contract to the defendant, allegations that the contract had been awarded as a result of bribes and sexual favors came to light. (*Id.* at pp. 1141–1142.) The plaintiff sought to recover money the defendant received as a result of being awarded the contract at

---

[15] The Restatement of Restitution, section 1, comment e, page 14, provides in part: "In other situations, a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust. In such cases, the defendant may be under a duty to give to the plaintiff the amount by which he has been enriched. Thus where a person with knowledge of the facts wrongfully disposes of the property of another and makes a profit thereby, he is accountable for the profit and not merely for the value of the property of the other with which he wrongfully dealt . . . ."

issue. (*Ibid.*) The Supreme Court rejected the plaintiffs' claim for these monies under the UCL, commenting: "The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants. First, it is clear that plaintiff is not seeking the return of money or property that was once in its possession. KSC has not given any money to Lockheed Martin; instead, it was from the Republic of Korea that Lockheed Martin received its profits. . . . [¶] . . . [¶] . . . [Further, KSC cannot establish that it had a vested interest in the money it seeks to recover because] KSC itself acknowledges that, at most, it had an 'expectancy' in the receipt of a commission. KSC's expected commission is merely a contingent interest since KSC only expected payment if MacDonald Dettwiler was awarded the SAR contract. [Citation.] Such an attenuated expectancy cannot, as KSC contends, be likened to 'property' converted by Lockheed Martin that can now be the subject of a constructive trust." (*Korea Supply, supra,* 29 Cal.4th at pp. 1149–1150.)

Each of the other cases Arcadia cites in support of its proposition is similarly distinguishable from this case. In *Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1005, 1016–1020 [36 Cal.Rptr.3d 592], a plaintiff class of investors brought an action alleging that the defendant had published fraudulent stock research reports that prevented investors from having " 'a sound basis for evaluating' " their investments. The monies as to which the plaintiffs sought disgorgement were profits and/or compensation the defendant had received from the public companies it was researching, not the investors' money. In *Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 459–462 [30 Cal.Rptr.3d 210], a plaintiff representing California electricity consumers sued a number of parties who participated in the restructuring of California's electricity market, alleging, among other things, that the Perot Systems defendant aided market participants in cheating Californians. The disgorgement the plaintiffs sought from Perot Systems bore no relationship to "ill-gotten gain from the utility overcharges," because the plaintiff did not allege that consumers had suffered overcharges as a result of Perot Systems's conduct. (*Id.* at p. 456.)

In *Pegasus Satellite Television, Inc. v. DIRECTV* (C.D.Cal. 2004) 318 F.Supp.2d 968, 979 (*Pegasus Satellite*), the plaintiff had not lost to the defendant any money in which the plaintiff had a vested interest. Pegasus, a nonparty to a contract between DIRECTV and a third party, sued DIRECTV, seeking disgorgement of "launch fees" that were due to the third party, on the basis that the third party was required to pass some of the launch fees on to Pegasus pursuant to a separate agreement between Pegasus and the third party. The trial court noted that pursuant to the agreement between Pegasus

and the third party, Pegasus was entitled only to launch fees that the third party "has already received from DirecTV." Thus, the court concluded, Pegasus's interest in the fees was contingent and had not vested; Pegasus could not get these contingent fees under a theory of restitution under UCL.

Similarly, in *National Rural Telecomm. Co-op v. DIRECTV* (C.D.Cal. 2003) 319 F.Supp.2d 1059, 1079, the plaintiffs were not seeking the return of any money that had once been in the plaintiffs' possession or in which the plaintiffs had a vested interest. The court framed its inquiry around whether the plaintiffs had a vested interest in the money they sought to recover from DIRECTV. As in *Pegasus Satellite*, the court concluded that the plaintiffs did not have a vested interest because their "experts did not identify particular funds or monies to which Plaintiffs were allegedly entitled," and the money the plaintiffs were attempting to recover simply constituted expectation damages "for what they believe they would have obtained" if DIRECTV would have performed on its agreement with a third party. (*National Rural, supra,* 319 F.Supp.2d at p. 1080.)

Finally, in *Watson Laboratories, Inc. v. Rhone-Poulenc Rorer* (C.D.Cal. 2001) 178 F.Supp.2d 1099, the pharmaceutical company plaintiff sued the pharmaceutical company defendant alleging a breach of contractual obligations to supply the plaintiff with a hypertension drug and to not compete with the plaintiff in that drug market. The question the trial court faced was "when the victim was never in possession of the wrongdoer's 'benefits' and never had a property interest in those 'benefits' does the remedy of restitution under [Business and Professions Code] § 17200 authorize transferring that property to the victim?" (*Watson Laboratories, supra,* at p. 1122, fn. omitted.) The trial court answered this question in the negative.

Thus, in all of the cases Arcadia cites to suggest that "profits" are not available to a plaintiff under the UCL, the plaintiff had not lost to the defendant any vested interest in money or property. That is not the case here. The monies the plaintiffs in this case seek to recover are monies that Arcadia is alleged to have wrongfully collected from the plaintiffs, and any interest Arcadia may have earned on these monies. The information the plaintiffs seek is, at a minimum, reasonably calculated to lead to the discovery of admissible evidence, since the plaintiffs are trying to determine whether any of Arcadia's profits can be traced directly to ill-gotten funds.[16]

---

[16] We do not intend to suggest that the plaintiff class ultimately will be able to establish the existence of a vested interest in any profits Arcadia may have received as a result of collecting money pursuant to an unlawful business practice. Rather, we merely recognize that in the context of this discovery dispute, it is not clear that the plaintiffs will *not* be able to establish that the disgorgement of certain profits made as a result of its unlawful practice falls under the rubric of "restitutionary disgorgement."

## IV.

## DISPOSITION

The trial court's grant of summary judgment as to the class claims against Arcadia is reversed. We also reverse that portion of the trial court's order denying the plaintiffs' motion to compel discovery responses to the interrogatories regarding whether Arcadia maintained the allegedly ill-gotten funds in a separate account and, if so, whether those funds earned profits, or, if not, the rate of return on the commingled funds. The matter is remanded to the trial court for further proceedings. Costs are awarded to appellants.

Benke, Acting P. J., and McIntyre, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 25, 2007, S155139. Kennard, J., and Corrigan, J., did not participate therein.