Filed 4/26/17; pub. order 5/25/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE ex rel. KAMALA HARRIS, as Attorney General,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS AGUAYO et al.,<br><br>    Defendants and Appellants. | B262557<br><br>(Los Angeles County<br>Super. Ct. No. VC048452) |

APPEAL from a judgment of the Superior Court of Los Angeles County. John Shepard Wiley, Jr., Judge. Affirmed.

Ronald E. Wiksell; Law Offices of James T. Duff and James T. Duff for Defendants and Appellants.

Kamala D. Harris, Attorney General, Nicklas A. Akers, Assistant Attorney General, Michele Van Gelderen, Steven De Salvo, and William R. Pletcher, Deputy Attorneys General, for Plaintiff and Respondent.

Jesus and Sofia Aguayo (appellants) appeal from a judgment entered after a 22-day bench trial in this civil enforcement action brought by the State of California (the People) against appellants for violation of the unfair competition laws (Bus. & Prof. Code, § 17200 et seq.) (UCL).[1]  The action arises out of a complex real estate scam through which appellants acquired and rented real estate belonging to others.  This civil proceeding follows two criminal trials which resulted in 31 criminal convictions related to the scheme, 29 of which were felonies.

The People proposed 1,574 violations of the UCL.  The court subtracted 27 vandalism violations and two theft violations.  The People also proposed 246 enhancements for violations against senior citizens, of which the court subtracted seven.  The court imposed a $750 penalty for each of the 1,784 total violations, resulting in a total fine of $1,338,000.  The court then added restitution of $2,636,854.50 for a total of $3,974.854.50 in restitution and civil penalties.  The court removed appellants' legal and recorded claims to all 43 of the properties that were subjects of the litigation.  Finally, the court imposed an injunction permanently enjoining appellants from (1) prosecuting future adverse possession actions or quiet title actions; (2) recording wild deeds; and (3) bidding or buying at property tax sales (with one exception).

Appellants make six main arguments on appeal.  First, they argue that their actions in obtaining properties under the law of adverse possession were immune from a UCL action under the *Noerr-Pennington* doctrine.  Second, they argue that the trial court's finding that the "wild" deeds filed by Jesus Aguayo

---

[1]     All further statutory references are to the Business & Professions Code unless otherwise noted.

purported to transfer a fictional interest between Jesus Aguayo and Sofia Aguayo was incorrect, as Jesus Aguayo had possession of those properties and thus an actual interest, albeit inferior to the record title holder's interest. Third, appellants argue that they held an absolute, nondivestable interest in seven specific properties which they acquired by adverse possession. Fourth, they argue that the restitution award is not supported by the evidence or the law, as they were entitled to keep the rents they collected. Fifth, they argue that the penalties are excessive. And finally, they argue that the permanent injunction was beyond the court's jurisdiction because it bars legally permitted conduct and constitutes punishment.

We find no reversible error and therefore affirm the judgment.

## BACKGROUND

Appellants married in 1972 and raised two children. Jesus Aguayo worked at Security Pacific Bank, rising to the position of Assistant Vice President for the Credit Department. In 1979, Jesus Aguayo started purchasing homes for investment opportunities at tax sales, trustee sales, and from third parties. He obtained a real estate license and a contractor's license in the 1980's.

**The scheme**

While studying for his real estate license, Jesus Aguayo learned about the laws of adverse possession. Beginning in 1988, appellants began acquiring properties pursuant to the scheme which has resulted in this litigation. Appellants would locate distressed properties in the public records. Thus, their targets were often individuals in the midst of financial misfortune. Their victims included the elderly, the infirm and mentally ill, and heirs of recently deceased titleholders. For example, appellants fraudulently caused several elderly victims to sign grant deeds

3

for zero dollars. In addition, appellants victimized individuals who were hospitalized or living in nursing homes. Other victims were in financial distress or incarcerated.

After locating a distressed property, appellants would go and take possession of the property. Thereafter, appellants would file false documents in an attempt to claim ownership of the property. They typically did this by creating and filing "wild deeds," deeds signed by a grantor who is unconnected to the property. Through these fraudulent documents, Jesus Aguayo, using the name Jesus Duran to obscure his relationship to Sofia Aguayo, would purport to transfer title to Sofia Aguayo for valuable consideration. In fact, Jesus Aguayo had no transferable interest in the property and no money was exchanged. Appellants then filed false Preliminary Change of Ownership Reports (PCOR) to determine transfer taxes and to appraise properties after transfer. (*People v. Aguayo* (May 29, 2013, B236827) [nonpub. opn.].) In the false PCOR's, appellants misrepresented alleged arms-length sales, failed to disclose that they were married, and falsely claimed that money was paid for the properties.

In order to avoid alerting individuals who were legitimately interested in the properties, appellants would steal mail, divert mail and divert tax statements from the homeowners to themselves. For example, falsely claiming to be the property owner's agent, appellants submitted change-of-address forms to Los Angeles County, requesting that property tax statements be sent to their own post office box. Appellants' strategy was evidenced by a handwritten note: "You do not want to wake up the dog."

If appellants went to the property and found someone living there who was not the titleholder, appellants would fraudulently obtain a quitclaim deed from the victim by claiming it was

necessary to clear up an alleged problem or to allow for payment of back taxes. In one case, appellants posed as government agents allegedly there to help the victim. Appellants encouraged people to sign deeds without explanation and without providing copies. When titleholders were living on these properties, appellants would fraudulently induce them to transfer their property in unconscionable transactions for little or no money. For example, appellants fraudulently induced one elderly victim who was behind on her taxes to transfer her home to appellants in a $0 grant deed, falsely representing that it was the only way she could keep her home.

In other cases where appellants found individuals living in the homes, appellants would force them out or bar them from the home. In one case, appellants falsely claimed to be the legal owners of a home and filed an unlawful detainer action to remove a family from the home. The family was not allowed to retrieve family pets. Appellants removed and threw away personal property from the homes, including clothing, furniture, family photos, and personal effects.

After fraudulently obtaining access to the homes, appellants would submit applications for building permits, falsely claiming that they were "owner-builder" and thus allowed to alter the properties. After doing unauthorized work on several properties, appellants rented them to unsuspecting third parties. Appellants conservatively estimated that they were receiving approximately $35,000 each month in rental income from the wrongful scheme.

In some cases, appellants filed quiet title actions to perfect their interest in the properties. To avoid a contested hearing, appellants served most of these actions by publication and deliberately failed to name people with an interest in the property, even when appellants knew who the titleholders or

heirs were and where they lived.  Appellants falsely represented to the courts that they did not know where the titleholders were, despite having reports from private investigators with title holders' addresses.  Appellants falsely told the court that the property was "vacant" and "abandoned" when they took possession, even when they had recently evicted residents.

Through this scheme, appellants were able to claim title to over 100 properties in Southern California, and they became, as they put it, "very rich."

**Criminal and civil cases related to appellants' scheme**

On October 18, 2006, appellants were arrested following an investigation due to a complaint of elder abuse.

In the first criminal trial against appellants, they were convicted of theft from an elder or dependent adult, two counts of felony trespass of a dwelling, vandalism, and conspiracy.  Each appellant was sentenced to three years probation.

In a second criminal trial, appellants were convicted of 19 counts of filing false PCOR's with the Los Angeles County Recorder's Office, five counts of filing false tax returns, and related conspiracy counts.  The convictions were affirmed by this court.  (*People v. Aguayo* (June 10, 2010, B212334) [nonpub. opn.] (*Aguayo I*); *People v. Aguayo* (May 29, 2013, B236827) [nonpub. opn.] (*Aguayo II*).)  Appellants were sentenced to three years imprisonment.  They completed their sentences.

In addition to the two criminal proceedings, the People brought this civil enforcement action under the UCL.  The People produced evidence of appellants' prior criminal convictions, but also produced evidence of more than 1,500 additional violations of the UCL, which covers a broader range of conduct than the criminal laws.

The People filed documentary evidence supporting the case-in-chief on September 10, 2013.  Beginning on March 4, 2014, the

trial court heard live testimony. Twelve witnesses testified for the People. Three witnesses testified for the defense, but appellants presented most of their evidence through the testimony of Jesus Aguayo. The trial court found that Jesus Aguayo's testimony was not credible. It specifically noted:

> "Jesus Aguayo was questioned at tremendous length, and usually he was a patient, calm, charming, and articulate witness. But he also was willing to say whatever was convenient, even when it was obviously and knowingly false. There were many occasions when his duplicity was plain to the court. . . . [¶] This court finds that Jesus Aguayo lied under oath. He did so repeatedly, even on matters as apparently innocuous as whether he owned a truck."

**The statement of decision, final judgment and permanent injunction**

A final statement of decision on the matter was issued on October 31, 2014. The court summed up the evidence on the Aguayo's wrongful acts as follows: "Sometimes they took advantage of elderly and vulnerable people like Ella Kaspar, using sharp practices to get claims to land. Sometimes they abused the process of adverse possession to target land not theirs for the taking. And sometimes they filed devious quiet title suits to secure their ill-gotten gains, thus using the courts to defeat the cause of justice." The court made it clear that a "variety of bad tactics" were used to claim title to all 43 properties at issue in this case. These bad tactics included the filing of wild deeds and "many other illegal, unfair, and fraudulent acts." Such wrongful tactics were used "for each of 43 properties."

The trial court noted that although the recording of wild deeds was a "simple and obvious deceit," Jesus Aguayo "continued to defend his deceitful tactic," arguing that appellants performed this manipulation in order to achieve their ultimate

goal of adverse possession.  The court found that the Aguayos "used this specific deceit repeatedly, for many different properties."

The trial court concluded that the People proved all three prongs of the UCL in that appellants' actions were (1) unlawful, (2) unfair, and (3) fraudulent.  The court specified that where its ruling did not "mention a specific point or matter, the court accepts the evidence and arguments of the Attorney General, who was the prevailing party."

The court expressly rejected appellants' claims that the *Noerr-Pennington* doctrine immunized their actions.  As to pre-lawsuit activity, like filing false PCOR's, the trial court found that these were not petitions to the government, protected speech or requests for government redress.  The court specified, "[appellants] cannot immunize misdeeds willy nilly by saying the misdeeds might culminate in litigation."  As for the lawsuits themselves, the trial court found that the Attorney General established that they were all shams.  The court held:  "The cases were objectively baseless.  [Appellants] did trick some judges into signing some judgments, but this would not have happened (1) had [appellants] given proper notice to all interested parties and (2) had [appellants] revealed the full picture to the courts."

By way of remedy, the court determined that it would "negate and remove by specific orders all [appellants'] legal and recorded claims to the 43 properties" that were the subject of the litigation.  The court further imposed a fine of $3,974,854.50 as restitution and civil penalty.  In discussing the restitution portion of the financial award, the court distinguished *People v. Lapcheske* (1999) 73 Cal.App.4th 571 (*Lapcheske*), explaining that, "the defendant in that case was not violating the unfair competition law by running a corrupt enterprise that was large scale and long term."

8

The court found that appellants had "no insight into their own wrongdoing.  They are defiant and self-justifying rather than sincerely contrite."  Thus, the court concluded that there was reason to fear recidivism.  To prevent future misconduct, the court imposed a specific injunction which forbade appellants from:  "(1) prosecuting future adverse possession actions or quiet title actions, (2) recording wild deeds, and (3) bidding or buying at property tax sales (with [one] exception . . .)."

The court denied the Attorney General's original request that "all of the 80 odd properties in the receivership be wrest from [appellants'] grasp."  However, the court agreed that all properties would remain in receivership until appellants paid the full amount of the restitution and penalty.

A final judgment and permanent injunction was filed on February 13, 2015.

On March 10, 2015, appellants filed their notice of appeal from the judgment.

## DISCUSSION

### I.  Applicable law and standards of review

The UCL is a law enforcement tool designed to protect consumers and deter and punish wrongdoing.  (*Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 503.)  It prohibits any "unlawful, unfair or fraudulent business act or practice." (§ 17200.)  Each of the three types of wrongful conduct is recognized as distinct from the others.  """[A] practice is prohibited as 'unfair' or 'deceptive' even if it is not 'unlawful' or vice versa.'"  [Citations.]"  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) The People may prove an unlawful act by showing virtually any violation of federal, state, or local law.  (*Ibid.*)  To show a fraudulent act, the law requires a showing that members of the public are """likely to be deceived.'"  [Citation.]"  (*Saunders v.*

*Superior Court* (1994) 27 Cal.App.4th 832, 839.) The fraudulent element may be proved even if there is no evidence that anyone was "'actually deceived, relied upon the fraudulent practice, or sustained any damage. [Citation.]'" (*Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1146.)

Section 17203 confers on the trial court broad discretion to "make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Thus, the trial court's imposition of restitution, civil penalties, and injunctive relief will not be disturbed absent an abuse of discretion. (*People ex rel. Kennedy v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 135 (*Beaumont*).) To show an abuse of discretion, appellants must demonstrate that the trial court's judgment "'exceeded the bounds of reason.'" (*People ex rel. Harris v. Sarpas* (2014) 225 Cal.App.4th 1539, 1552 (*Sarpas*).) Where "'there is a [legal] basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court.' [Citation.]" (*Ibid.*) "'"[W]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence."' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 726.)

Constitutional claims, such as those based on the *Noerr-Pennington* doctrine, are reviewed de novo, "but with deference to underlying factual findings, which we review for substantial evidence, viewing the record in the light most favorable to the ruling. [Citations.]" (*City and County of San Francisco v. Sainez* (2000) 77 Cal.App.4th 1302, 1313.)

## II. The *Noerr-Pennington* Doctrine

### A. *Applicable law*

The *Noerr-Pennington* doctrine immunizes legitimate efforts to influence a branch of government from virtually all forms of civil liability. (*Tichinin v. City of Morgan Hill* (2009) 177 Cal.App.4th 1049, 1065 (*Tichinin*).) The doctrine originated in the context of federal anti-trust litigation. Stated generally, it was initially intended to ensure that "efforts to influence government action are not within the scope of the Sherman Act, regardless of anticompetitive purpose or effect. [Citations.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 320.) The *Noerr-Pennington* doctrine is reinforced by two constitutional considerations: "the First Amendment right to petition the government . . . and comity, i.e., noninterference on the part of the courts with governmental bodies that may validly cause otherwise anticompetitive effects and with efforts intended to influence such bodies. [Citations.]" (*Id.* at p. 321.)

"The *Noerr-Pennington* doctrine has been extended to preclude virtually all civil liability for a defendant's petitioning activities before not just courts, but also before administrative and other governmental agencies. [Citations.]" (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 964 (*Gallegos*).) "'It is only when efforts to influence government action are a "sham" that they fall outside the protection of the *Noerr-Pennington* doctrine.'" (*Id.* at p. 965.) Efforts to influence governmental agencies "'amount to a sham when though "ostensibly directed toward influencing governmental action, . . . [they are] actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . ." [Citation.] . . .' [Citation.]" (*Ibid.*) The United States Supreme Court has set forth a two-part test for determining whether a defendant's petitioning activities fall within the so-called "sham

11

exception" to the *Noerr-Pennington* doctrine:  "first, it 'must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; and second, the litigant's subjective motivation must 'conceal an attempt to interfere *directly with the business relationships of a competitor . . . through the use [of] the governmental process* -- as opposed to the *outcome* of that process -- as an anticompetitive weapon.' [Citation.]"  (*BE&K Constr. Co. v. NLRB* (2002) 536 U.S. 516, 526.)

Unlawful actions may not be subject to immunity under the *Noerr-Pennington* doctrine.  (*FTC v. Superior Court Trial Lawyers Ass'n.* (1990) 493 U.S. 411, 421-425 [illegal boycott not immunized]; *Allied Tube & Conduit Corp. v. Indian Head* (1988) 486 U.S. 492, 503-504 (*Allied*) [refusing immunity for defendants' alleged collusion].)  Thus, the *Noerr-Pennington* doctrine does not necessarily "immunize otherwise unlawful [activity] by pleading a subjective intent to seek favorable legislation or to influence governmental action."  (*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.* (1993) 508 U.S. 49, 59.)

### B.  Appellants' unlawful scheme is not entitled to immunity under the Noerr-Pennington *doctrine*

Appellants argue that the *Noerr-Pennington* doctrine protects not only the filing of a lawsuit, but any conduct incidental to the filing of a lawsuit.  Appellants argue that their conduct in filing quiet title lawsuits, and any conduct in anticipation of such lawsuits, was immunized under *Noerr-Pennington*.  Appellants point out that they obtained judgments and settlements in the courts for seven specific properties, and that eight other properties were in litigation.

However, appellants assert that all of their conduct at issue in this lawsuit is protected by the *Noerr-Pennington* doctrine, because all actions with respect to the properties at issue were

12

undertaken in anticipation of quiet title lawsuits.  Appellants cite *Tichinin* for the proposition that conduct incidental to protected petitioning activity is likewise protected by the *Noerr-Pennington* doctrine if the petition itself is protected.

Appellants' argument is flawed because appellants admitted that they did not intend to file quiet title actions as to every property at issue in this case.  However, even if appellants had intended to file quiet title actions for each property, we find that appellants' wrongful actions do not fall within the scope of activity protected under the *Noerr-Pennington* doctrine because the actions at issue were not closely related to any legitimate petitioning activity.

**1.  The conduct at issue was not incidental to government petitioning**

Appellants are correct that the filing of a lawsuit, and conduct closely related to the litigation, are generally protected under *Noerr-Pennington.  Tichinin, supra,* 177 Cal.App.4th at page 1067, confirms that the *Noerr-Pennington* doctrine extends "beyond the conduct specified in the First Amendment itself:"

> "Thus, the right of free speech encompasses not only expressive speech and symbolic conduct but also nonexpressive conduct closely related to the full exercise of First Amendment rights, such as contributing money to a political campaign. [Citations.]  In the context of the right to petition, collateral protection has been extended to a railroad's public relations campaign aimed at influencing passage of favorable legislation [citation]; recommending or hiring specific lawyers to represent or advise union members [citations]; and, . . . discovery conduct, and the refusal to accept a settlement offer [citation].

(*Tichinin, supra,* 177 Cal.App.4th at p. 1067.)

13

In *Tichinin,* the prelitigation investigation into a possible conflict of interest due to an alleged inappropriate romantic relationship between public officials was held to be sufficiently closely related to the right to petition so as to be protected. (*Tichinin, supra,* 177 Cal.App.4th at p. 1067.)  The court explained, "the prelitigation investigation of a potential claim is no less incidental or related to possible litigation than prelitigation demand letters and threats to sue, which are entitled to protection."  (*Id.* at p. 1069.)  However, the *Tichinin* court noted that conduct which constitutes "a separate and distinct activity" from litigation is not protected.  (*Id.* at p. 1065.)

Illegal rent skimming, trespass, theft, mail theft, fraud, misrepresentations to tenants, and recording false documents, among other things, are not protected petitioning activity under *Noerr-Pennington* and its progeny.[2]  Nor do these activities fall under the protected categories of "prelitigation investigation" or "prelitigation communications among parties" discussed in *Tichinin.*  (*Tichinin, supra,* 177 Cal.App.4th at pp. 1068-1069.)  Appellants present no case law suggesting that conduct so far removed from actual litigation is protected.[3]

---

[2]    The specific violations for which appellants were held liable fell into the following categories:  trespass, vandalism, theft, mail theft, false deeds, false PCORs, diverted mail, false permits, illegal rents, lying to tenants, false tax returns, HOX (presumably homeowner's exemptions), unconscionables, false deeds, no due process, and elder violations.

[3]    While appellants emphasize that they obtained certain properties through litigation, and other properties were in pending litigation, appellants ignore the trial court's factual finding that wrongful tactics were used to acquire each of the 43 properties at issue.  The wrongful tactics, such as those listed above, were not reasonably related to litigation.  Thus, those

**2. The conduct at issue was not undertaken for the primary purpose of influencing a government entity**

Further, appellants' wrongful actions were not undertaken for the primary purpose of influencing a governmental entity. Appellants' wrongful actions were directed against private individuals and involved private properties. As explained by the Supreme Court in *Allied*, the question of whether an action will be granted immunity pursuant to the *Noerr-Pennington* doctrine depends on the "context and nature" of the activity. (*Allied, supra*, 486 U.S. at p. 504.) In declining to find immunity, the *Allied* court emphasized that the actions at issue took place in the context of a standard-setting process of a private association, not a governmental entity. (*Ibid*.) Thus, the wrongful actions were not undertaken for the primary purpose of influencing a governmental body. Similarly, here, appellants have wrongfully possessed private property, fraudulently obtained title to private property, and collected rents on private property to which they were not entitled. Appellants are not entitled to immunity in this civil restitution action simply because they intended to deceive the courts as well. As the *Allied* court explained, "[t]he ultimate

---

properties that were the subjects of petitions before a court are no exception to the ruling that the *Noerr-Pennington* doctrine is inapplicable. A trial court has the power to void judgments that were "founded upon or conceived in fraud, and [in which] the machinery of the law was resorted to for the purpose of enforcing what was known to be a fraudulent demand." (*Dunlap v. Steere* (1891) 92 Cal. 344, 349; see also *Carr v. Kamins* (2007) 151 Cal.App.4th 929, 936-937 [setting aside prior judgment where adverse possessor violated due process rights of titleholder by not giving notice of quiet title action].) Thus, where appellants' wrongful actions resulted in an unjust court judgment, the trial court had the power to undo those judgments.

aim is not dispositive." (*Ibid.*)  Appellants' actions are not immune under *Noerr-Pennington*.

### 3. *Gallegos* is distinguishable

Appellants rely on *Gallegos*.  In *Gallegos,* the State filed a complaint against a lumber company alleging violations of the UCL.  (*Gallegos, supra,* 158 Cal.App.4th at p. 954.)  The allegations arose from an agreement between the State and the lumber company regarding the sale to the State of an ancient redwood forest in exchange for monetary compensation and other consideration, along with assurances that the lumber company would be permitted to harvest certain of its remaining timberlands in accordance with a habitat conservation plan.  An intensive review of the agreement had occurred pursuant to the California Environmental Quality Act (CEQA).  The State alleged in its complaint that the lumber company intentionally misrepresented and concealed crucial facts during the CEQA administrative proceedings, including submitting a report containing false data.  (*Id.* at pp. 955-956.)  The *Gallegos* court first determined that the lumber company's actions were protected by the litigation privilege under Civil Code section 47, subdivision (b).  Although it did not need to reach the issue, the court then determined that appellants' improper tactics during the administrative process were part of a genuine effort to secure approval of its plan, thus did not fall under the sham exception to *Noerr-Pennington.*

The court noted the concern for comity with respect to decision-making when it comes to the *Noerr-Pennington* doctrine, stating that the lumber company's "challenged activities were directed at the . . . independent state agencies engaged, pursuant to California law, in the CEQA process.  We have already determined those activities were genuinely intended to influence government action, not mere sham activities intended to use

16

governmental processes to interfere with a competitor's business relationships." (*Gallegos, supra*, 158 Cal.App.4th at p. 969.)

Appellants' actions in defrauding people out of their homes are not akin to the fraudulent litigation tactics at issue in *Gallegos*, and we decline to expand the doctrine to encompass appellants' fraudulent acts.[4]

## III. The evidence supports the trial court's findings regarding "wild deeds"

Appellants argue that the trial court erred in finding that by filing wild deeds, Jesus Aguayo purported to convey to Sofia Aguayo a fictional interest in a piece of property that neither of them owned. Appellants argue that the trial court's finding ignores Civil Code section 1006, which provides that:

> "Occupancy for any period confers a title sufficient against all except the state and those who have title by prescription, accession, transfer, will, or succession; but the title conferred by occupancy is not a sufficient interest in real property to enable the occupant or the occupant's privies to commence or

---

[4]   The people did not seek UCL liability for appellants' acts of filing quiet title lawsuits, and the court did not impose liability for appellants' actions incidental to the filing of those lawsuits. Thus, we need not decide whether those lawsuits fall within the sham exception to the *Noerr-Pennington* doctrine. Nor are we required to affirm on the same basis as the trial court. (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 269.) Instead, as explained above, illegal rent skimming, fraud, trespass, theft, mail theft, and misrepresentations to tenants, among other things, are not closely related to any petitioning activity under the *Noerr-Pennington* doctrine and thus fall outside of its protection. Further, as in *Allied, supra*, 486 U.S. at page 504, the context and nature of the conduct at issue in this proceeding shows that it was not undertaken for the primary purpose of influencing a governmental body.

17

maintain an action to quiet title, unless the occupancy has ripened into title by prescription."

Appellants argue that Jesus Aguayo took possession of properties, and this possession gave him an occupancy interest which he transferred to his wife by quitclaim deed. Appellants cite *City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232 (*Manhattan Beach*) for the proposition that a quitclaim deed does not require full title to be transferred. Appellants further cite 3 Mill & Starr, California Real Estate (3d ed. 2011) section 8.12 for the proposition that a quitclaim deed is a valid instrument even though the grantor does not have any estate or right to occupy the property.[5]

We assume, based on the trial court's findings regarding the structure of appellants' fraudulent scheme, that appellants occupied the property as set forth in Civil Code section 1006. However, the legal authority cited by appellants does not support their claim. *Manhattan Beach* does not suggest that a property occupant may transfer an interest by quitclaim deed. The case involves a strip of land that was conveyed to a railroad company, and a determination of whether the deed conveyed a fee simple or only an easement. (*Manhattan Beach, supra*, 13 Cal.4th at pp. 235-236.) The case provides no support for appellants' position that their fraudulent quitclaim deeds conveyed any actual interest in the properties at issue.

Further, the treatise cited by appellants for the proposition that an individual need have no estate or right to occupy the property is not controlling authority in this court. Therefore we decline to consider it. Appellants have failed to show that the

---

[5]  It appears that appellants intended to cite 3 Miller & Starr, California Real Estate (3d ed. 2011) section 8:13.

18

court erred in determining that the wild deeds, conveying a fictional interest in those properties, were "flagrant wrongs."

*People v. Denman* (2013) 218 Cal.App.4th 800 (*Denman*), supports the trial court's determination that the wild deeds were unlawful.  In *Denman*, the defendant, like appellants, targeted distressed properties and filed quitclaim deeds transferring the properties to himself despite having no right of ownership or title. (*Id.* at p. 802.)  In addition, like appellants, defendant established renters on those properties.  (*Id.* at pp. 805-806.)  Defendant was found guilty of 20 counts of recording false documents within the meaning of Penal Code section 115, which makes it a felony to knowingly procure or offer any false or forged instrument for filing in a public office.  In affirming the defendant's convictions on appeal, the *Denman* court noted:  "The documents themselves were false in that they transferred an interest that he did not have to himself and then he recorded the document, clouding the title of the true property owners."  (*Id.* at p. 809.)  Similarly, here, Jesus Aguayo, under a false name, filed quitclaim deeds transferring an interest he did not have to his wife, Sofia Aguayo, and then recorded the document.  The trial court did not err in finding this act to be unlawful, unfair, and fraudulent.

## IV.  Adverse possession is not a defense to UCL liability

Appellants contend that they have acquired seven properties by adverse possession, therefore they have an absolute, non-divestible interest in those properties under California law.[6]  Under the law of adverse possession, the

---

[6]     A party may claim title to another's land where the party can show:  "(1) possession by actual occupation under circumstances sufficient to constitute reasonable notice to the owner's title; (2) possession hostile to the owner's title; (3) possession whereby the holder claims the property as his own under either color of title or claim of right; (4) continuous and

19

possessor need not bring an action to perfect his or her claim of title. (*Marriage v. Keener* (1994) 26 Cal.App.4th 186, 191 (*Marriage*).) Instead, the record owner must bring an action within five years of the adverse possession. (Code Civ. Proc., § 318.) Appellants argue that there are seven properties that they have adversely possessed for more than five years. Thus, appellants argue, the five year statute of limitation bars any challenge to their ownership interest in these properties. Appellants cite *Marriage* for the proposition that "'[t]itle to property acquired by adverse possession matures into an absolute fee interest after the statutory prescriptive period has expired. Thus, adverse possession for the requisite period of time not only cuts off the true owner's remedies but also divests him of his estate . . . .'" (*Marriage*, at p. 192.) Appellants assert that the running of the five-year statute of limitation bars any challenge to appellants' ownership interest in these seven properties.

Appellants fail to cite any law suggesting that the laws of adverse possession bar a UCL claim where the adverse possession was based on unlawful, unfair, and fraudulent acts. The doctrine of adverse possession does not immunize an individual from criminal or civil liability for his acts. (See, e.g., *Lapcheske, supra*, 73 Cal.App.4th at pp. 573-575 [adverse possessor may be guilty of trespass and rent skimming]; *Denman, supra,* 218 Cal.App.4th at pp. 817-819 [affirming conviction of adverse possessor for filing false quitclaim deeds].) In fact, an adverse possessor is, by definition, a trespasser. (*Lapcheske, supra*, at p. 575 ["one taking possession under color of right established by physical presence on the property as an occupant,

___

uninterrupted possession for five years; [and] (5) the holder has paid all taxes levied on the property during those five years." (*Finley v. Yuba County Water Dist.* (1979) 99 Cal.App.3d 691, 697.)

20

is 'in possession as a naked trespasser'"].) The adverse possession doctrine merely provides that a trespasser may eventually become a legitimate possessor under certain circumstances. (*Ibid.*)

The trial court held that each of the 43 properties at issue in this matter, including the seven appellants claim to have adversely possessed, were acquired through wrongful means. The wrongful acts, such as rent skimming, trespass, theft, mail theft, misrepresentations to tenants, and filing false documents, occurred before the five-year period ran.[7] Because appellants acquired these properties through unlawful, unfair and fraudulent acts, it is irrelevant whether appellants eventually met the requirements of adverse possession, and the doctrine does not immunize them from the penalties imposed by the court.

## V. The restitution award is supported by the evidence and the law

The court ordered appellants to pay $2,636,854.50 in restitution. The restitution consists of three components: (1) rents collected by appellants; (2) rents collected by the court appointed receiver; and (3) $60,000 to Barron Fleming. Appellants challenge all three of the restitution awards. The awards are reviewed under an abuse of discretion standard. (*Beaumont, supra*, 111 Cal.App.4th at p. 135.)

---

[7] Appellants do not cite to any specific evidence suggesting that the wrongful acts occurred after the properties were adversely possessed. Thus, we infer both due to the nature of the wrongs and the court's finding that appellants "used a variety of bad tactics to claim title to 43 properties," that appellants undertook such wrongful acts during the five-year period before they allegedly adversely possessed those properties.

### A. *The restitution order was not an abuse of discretion*

Preliminarily, appellants argue that the trial court should not have awarded restitution of rents at all. Appellants point out that the trial court is not required to provide restitutionary relief when such an award does not accomplish justice. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 180 (*Cortez*).) Instead, the court's goal is to "accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved. [Citations.]" (*People v. Superior Court* (1973) 9 Cal.3d 283, 286.) Appellants argue that the former position of each victim in this case was owning a "tax defaulted, uninhabitable, unrentable house, or vacant piece of land which [a]ppellants saved from tax sales and improved." Here, appellants argue, because the properties will be returned to the rightful owners, the owners will be receiving back far more than what they had prior to the time appellants took over their properties. Upon return of these now improved properties, appellants argue, the victims will be receiving far more than the "*status quo ante.*" (*People v. Superior Court, supra*, at p. 286.) Any rent payments to these victims will be far in excess of a restoration of the status quo. In fact, appellants argue, such payments will be a windfall to the recipients since they will have already received back more than the status quo ante with the improved properties.

"[T]he trial court's discretion to award restitution under the UCL is very broad. [Citation.]" (*Beaumont, supra*, 111 Cal.App.4th at p. 135.) As set forth in section 17203, the court "may make such orders or judgments, . . . as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." The object is to return to the plaintiff "funds in

22

which he or she has an ownership interest." (*Beaumont*, at p. 135.) The trial court's decision to return rents to the rightful owners of property was in line with this goal.

Further, the court was not required to limit its award to returning the homes to the victims. "''[R]estitution, as used in the UCL, is not limited only to the return of money or property that was once in the possession of that person." [Citation.] Instead, restitution is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest.' [Citations.]" (*Juarez v. Arcadia Financial, Ltd.* (2007) 152 Cal.App.4th 889, 915.) The property owners had a vested interest in the rents appellants collected on their properties.

Nor was the court required to find individualized harm to each victim by appellants' fraudulent actions. "[T]he rule that restitution under the UCL may be ordered without individualized proof of harm is well settled. [Citations.]" (*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.* (2002) 104 Cal.App.4th 508, 532 (*Fremont*).) The court was permitted to "'order restitution . . . in order to deter future violations of the unfair trade practice statute and to foreclose retention by the violator of its ill-gotten gains.' [Citation.]" (*Id.* at p. 531.)

Finally, the trial court was not required to believe appellants' evidence that they drastically improved each and every property after possessing such property. Some properties were declared public nuisances, and others were in seriously substandard condition. There was evidence that the condition of some properties deteriorated, including an admission by Jesus Aguayo that he kept certain properties in such bad condition that it was possible he could be considered a "slumlord." The record shows that the trial court discounted much of appellants' evidence, particularly the evidence based on the testimony of Jesus Aguayo. The court specifically noted that Jesus Aguayo

23

had no independent recollection of money spent on improvements or the dates he allegedly possessed properties, but read from attorney prepared statements.  The court also noted that appellants failed to support their claims of improvements with actual receipts.[8]

The court's remedy is "based on appropriate factors, and it accomplishes the statutory objective of restoring to the victims sums acquired through [appellants'] unfair practices." (*Beaumont, supra,* 111 Cal.App.4th at p. 135.)  We find no abuse of discretion in the court's decision to award rents wrongfully collected by appellants to the rightful owners of the properties.

### B.  The trial court did not err in determining that appellants were unjustly enriched by collecting rents

Next, appellants argue that they were not unjustly enriched by the rents because they were legally entitled to keep the rents.  Appellants rely on *Lapcheske* for the proposition that an adverse possessor has the right to collect and retain rents.  In *Lapcheske,* the defendant, who engaged in acts similar to appellants' although on a lesser scale, was convicted of one count of rent skimming in violation of Civil Code section 890 and three counts of conspiracy:  one to commit trespass, another to commit grand theft, and the third to commit rent skimming.  The defendant asserted that he was not guilty because he entered the properties in question with the intent of ultimately acquiring them by adverse possession.  The *Lapcheske* court reversed the judgment as to the conspiracy to commit grand theft, but affirmed all other convictions.  (*Lapcheske, supra*, 73 Cal.App.4th at p. 576.)  In discussing the reversal of the conspiracy to commit

---

[8]     The court noted in its statement of decision that Jesus Aguayo lied about the receipts, referring to them as "the supposedly missing receipts that were not missing at all but merely nonexistent in the first place."

grand theft conviction, the court noted that "an adverse possessor has a right equal to that of the actual title holder to place a tenant in possession of the property and collect rent from that tenant." (*Ibid.*) The court concluded that the defendant "could not be guilty of grand theft as to the rent received because he was entitled to keep that rent, subject only to the obligation created under Civil Code section 890 . . . to apply that rent to the mortgage encumbrance." (*Ibid.*)

Appellants' reliance on *Lapcheske* for the purpose of reversing a restitution remedy under the UCL is misplaced. A conviction for grand theft is not at issue in this matter. Instead, appellants are liable for civil wrongs committed under the UCL, which condemns unlawful, unfair, or fraudulent actions. Appellants' argument their actions were legal under *Lapcheske* does not address the unfair or fraudulent nature of their actions. Further, as the *Lapcheske* court noted, because the rent collection constituted rent skimming, it was not legal.

Two statutes are relevant to the trial court's finding that appellants were guilty of unlawful activity, including unlawful occupation for the purpose of renting, and rent skimming. Penal Code section 602.9 provides that "any person who, without the owner's or owner's agent's consent, claims ownership or claims or takes possession of a residential dwelling for the purpose of renting that dwelling to another is guilty of a misdemeanor." In addition, Civil Code, section 890, subdivision (a)(2), provides that "rent skimming" constitutes the receipt of revenue from the unauthorized rental of a parcel of residential real property. Civil Code section 891, subdivision (f), provides that "[r]ent skimming is unlawful."[9]

---

[9]     Appellants argue that under Civil Code section 890, subdivision (a)(1), the definition of "rent skimming" is restricted

25

The trial court found that appellants' acts of collecting rent on the properties at issue constituted criminal activity. Thus, the rent collection was unlawful, as well as unfair and fraudulent. The trial court did not abuse its discretion in finding that appellants were unjustly enhanced by those rents and ordering their return.[10]

---

to using revenue within the first year of acquiring the property without applying it to the payments due on all mortgages or deeds of trust. This is incorrect. Civil Code section 890, subdivision (a)(1) provides: "'Rent skimming' means using revenue received from the rental of a parcel of residential real property at any time during the first year period after acquiring that property without first applying the revenue or an equivalent amount to the payments due on all mortgages and deeds of trust encumbering that property."

Civil Code section 890, subdivision (a)(2), provides: "'[R]ent skimming' *also* means receiving revenue from the rental of a parcel of residential real property where the person receiving that revenue, without the consent of the owner or owner's agent, asserted possession or ownership of the residential property, whether under a false claim of title, by trespass, or any other unauthorized means, rented the property to another, and collected rents from the other person for the rental of the property." (Italics added.)

The word "also" encompasses the definition in subdivision (a)(2) of the statute, which is not limited to the first year after acquisition. Thus, it is irrelevant whether appellants engaged in wrongful rent collection during the first year of acquisition or in subsequent years.

[10] Appellants also argue that the order to return rents should be reversed because "[a]ppellants spent $1,044,193.38 over 25 years on the subject properties which expenses do not include their labor." Appellants argue that they were not unjustly enriched by collecting rents because they paid more to improve the properties than they collected in rents. As discussed above,

26

*C.  The trial court did not abuse its discretion in ordering rent money collected by the receiver to be paid as restitution*

Appellants argue that the order requiring appellants to pay as restitution rents collected by the receiver should be reversed. Appellants argue that they did not benefit from the money collected by the receiver and, in fact, the money benefitted the properties ordered to be returned.  However, a receiver "'is an officer of the court whose possession of property is that of the court for the benefit of all persons who may show themselves to be entitled to it.  [Citations.]'" (*Pac. Indem. Co. v. Workers' Comp. Appeals Bd.* (1968) 258 Cal.App.2d 35, 40, fn. omitted.)  The trial court determined that the victims in this case were entitled to those rents, and the evidence supports that determination.

*D.  The trial court did not abuse its discretion in awarding restitution of $60,000 to Barron Fleming*

Appellants provide a brief argument, lacking in both factual and legal citations, regarding a victim named Barron Fleming.  Appellants cite to two settlement agreements in the record.  Without any explanation of the underlying issues in the prior lawsuits, appellants argue that because the property at issue was twice litigated and resolved with court approved settlements, they should not owe anything to Barron Fleming.

Appellants have not set forth any evidence or argument undermining the trial court's findings that appellants engaged in conduct that was unlawful, unfair, or fraudulent as to each property at issue, including the property in which Barron Fleming had an interest.  Nor have they explained why Barron Fleming received a different award from other victims, nor the

the trial court did not find appellants' evidence regarding their improvement expenses to be credible.  Therefore, we decline to disturb the judgment on this ground.

basis for that award.  "We need not address points in appellate briefs that are unsupported by adequate factual or legal analysis. [Citations.]"  (*Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.* (2006) 135 Cal.App.4th 793, 814 (*Placer County*).)

Further, the court specifically held that the court judgments related to the properties were a result of fraud on the courts.  Specifically, the court stated:  "[Appellants] did trick some judges into signing some judgments, but this would not have happened (1) had [appellants] given proper notice to all interested parties and (2) had [appellants] revealed the full picture to the courts."  Appellants cite no evidence suggesting that the trial court was wrong in determining that the courts did not have the full picture when it approved the settlements related to the property in which Barron Fleming has an interest. Further, the fact that there were two lawsuits regarding the property in which Barron Fleming has an interest does not mean that he was compensated for wrongful acts that were not the subject of those lawsuits.  We have no reason to disturb the trial court's award of $60,000 as restitution to Barron Fleming for appellants' wrongful acts in connection with that property.

## VI.  The civil penalties awarded are within the trial court's discretion

Appellants challenge the trial court's imposition of penalties, arguing that (1) they are being penalized for a legitimate activity; (2) there was no evidence of harm to the victims from any asserted violations; and (3) the penalties will leave appellants homeless and without any assets.

### A.  Background and applicable law

The trial court imposed $1,338,000 in civil penalties against appellants, consisting of 1,784 UCL violations at $750 per violation.  The violations included 1,222 violations for collecting

rents; 34 trespass violations; 42 violations for telling tenants they owned properties they did not own; 42 violations for rental agreements; 18 violations for not changing home owners' exemptions; 18 tax violations, and assorted other violations.

The UCL provides that any person who engages in unfair competition "shall be liable" for up to $2,500 per violation. (§ 17206, subd. (a).) In addition, the court may impose an additional civil penalty of up to $2,500 for each violation perpetrated against a senior citizen or disabled person. (§ 17206.1.) "'[T]he amount of the penalty lies within the court's discretion. [Citation.]' [Citations.]" (*Beaumont, supra*, 111 Cal.App.4th at p. 127.) The trial court's penalty is presumed correct. (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1259). Under the abuse of discretion standard, "'[w]here there is a [legal] basis for the trial court's ruling and it is supported by the evidence, a reviewing court will not substitute its opinion for that of the trial court.' [Citation.]" (*Sarpas, supra*, 225 Cal.App.4th at p. 1552.)

"[E]quitable defenses may not be asserted to wholly defeat a UCL claim," but equitable considerations may guide the court's discretion in fashioning the remedies authorized by section 17203. (*Cortez, supra*, 23 Cal.4th at p. 179.) "[C]onsideration of the equities between the parties is necessary to ensure an equitable result." (*Id.* at p. 181.)

Viewing their arguments on civil penalties as a whole, appellants are essentially asking this court to revisit the trial court's determination of the equities in this case. Appellants have a heavy burden, given that "[t]he court's discretion is very broad."[11] (*Cortez, supra*, 23 Cal.4th at p. 180.)

---

[11] Appellants provide a list of cases and corresponding UCL penalties. (*People v. Toomey* (1984) 157 Cal.App.3d 1, 23

29

## B. The trial court did not abuse its discretion in determining the civil penalties

Appellants' first argument is that the 1,222 rent collections were lawful under *Lapcheske*. In related arguments, they claim that the violations for leasing the properties they did not own and lying to tenants about their ownership of the property was not improper, since they were entitled to rent the property under *Lapcheske*. As explained previously, this argument fails. Appellants' rent collections constituted illegal activity under both

[150,000 misleading sales solicitations resulting in penalty of $150,000 at $1.00 per violation]; *People v. Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119, 132 [500,000 misleading and deceptive contracts, numerous oral representations and 1,500 false repair invoices resulting in penalty of $100,000 or approximately $5 per violation]; *People ex rel. Van de Kamp v. Cappuccio* (1988) 204 Cal.App.3d 750, 765 [592 violations of understating weight of purchased squid resulting in civil penalty of $73,528.05 or $124.20 per violation]; and *People v. Bestline Products, Inc.* (1976) 61 Cal.App.3d 879, 923 [3,000 violations for false representation regarding income distributors could earn resulting in penalties of approximately $330 for each violation].) However, it is not our role to reverse a penalty award simply because other cases, decided over 25 years ago, made different decisions regarding penalties involving very different violations. The one exception is *Beaumont*, where the court found over 14,000 separate violations for collecting monthly rents in excess of rent controls. The court imposed a fine of $525,000, or approximately $37 per violation. We note that in *Beaumont*, "the court's assessment was 'tempered' by its finding that defendants' conduct was not unfair or fraudulent but merely unlawful." (*Beaumont, supra,* 111 Cal.App.4th at p. 130.) Here, the trial court's assessment was based on violations of all three prongs of the UCL. Each act of the appellants was unlawful, unfair and fraudulent. Thus, *Beaumont* does not provide a flawless comparison, and we decline to reverse the trial court's judgment because the *Beaumont* court made a different analysis.

30

Penal Code section 602.9 and Civil Code section 891. Appellants' argument that they were entitled to the rents because they had physical possession of the property is incorrect. Thus, this portion of the penalty will not be overturned.

Appellants next challenge the 34 trespass penalties, arguing that the trial court made no analysis of how the passage of time makes such a trespass lawful. (Citing *Packard v. Moss* (1885) 68 Cal. 123, 127 ["An adverse claimant of land is a wrong-doer, and as such is treated and known to the law, until, by the lapse of years, his acts, before tortious, are consecrated by time and dignified as lawful"].) The court was not required to make such an analysis. The trespass violations were part of appellants' greater scheme to deprive individuals of their property and were properly considered as such. The doctrine of adverse possession does not immunize appellants from liability. (See *Lapcheske, supra*, 73 Cal.App.4th 571; *Denman, supra*, 218 Cal.App.4th 800.)

Appellants claim that they should not be penalized for failing to change the tax rates for the homeowner's exemptions on 18 homes. Appellants argue that, as non-record titleholders, they could not change the tax basis with the Assessor's Office. Appellants cite no law in support of this argument, and it fails for this reason alone. Further, the People presented evidence suggesting that appellants could have taken steps to update the tax rate. The trial court was entitled to believe this evidence.[12]

---

[12] Appellants claim that they provided expert testimony from a property assessment specialist indicating that the Assessor's Office would not update the Assessor's records for an adverse possession until the Assessor's Office received a court order. However, the people presented contrary evidence, including evidence of a form appellants could have used to alert the county to their claim and request a substitute tax statement.

31

Twenty-five penalties were assessed against appellants for filing wrongful quitclaim deeds on properties in which they had no interest. Appellants argue that they should not be penalized for these actions, as the deeds gave notice to the world of their adverse possessory interest. On the contrary, the trial court's finding that the acts of filing these wild deeds were unlawful, unfair, and fraudulent is supported by the record. As in *Denman*, the documents were deceitful. Using a fake name, Jesus Aguayo transferred an interest that he did not possess. By recording the false documents, he clouded the title of the true property owners. Under *Denman*, these acts were illegal. (*Denman, supra*, 218 Cal.App.4th at p. 809.) The penalties were therefore appropriate.

Appellants' argument regarding the tax penalties consists of one sentence: "No evidence was presented that the tax convictions, which resulted in no tax loss, were UCL violations." This argument is insufficient on its face, as it is utterly devoid of factual or legal support. "We need not address points in appellate briefs that are unsupported by adequate factual or legal analysis. [Citations.]" (*Placer County, supra*, 135 Cal.App.4th at p. 814.)

Further, appellants argue that there was no harm to the public resulting from their violations and that the equities weigh in their favor. Appellants argue that there is no evidence that anyone relied on the false PCORs or the wild deeds. Further, appellants argue, they expended thousands of hours of hard labor to improve properties and neighborhoods, and increased the values of the properties they took. Appellants argue that it was therefore an abuse of discretion for the court to award $1,338,000 in penalties.

As set forth above, the people were not required to prove specific harm arising from appellants' violations. (*Fremont, supra*, 104 Cal.App.4th at p. 532.) Section 17206 mandates that a penalty must be assessed for every violation of the UCL. In

assessing the penalty, the court must consider the circumstances, including, but not limited to: "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." (§ 17206, subd. (b).)

The court viewed the evidence differently from appellants. In contrast to appellants, the court determined that appellants had indeed caused harm. The court found that appellants took advantage of elderly and vulnerable people, using "sharp" practices and abusing the adverse possession process. They filed devious lawsuits and used the courts to defeat justice. In sum, they left a "long and wrongful trail" of misdeeds including creating false records and lying. These actions were not harmless. Further, the court discredited the testimony of Jesus Aguayo, including his testimony that he had largely improved the properties at issue. "'We do not reweigh evidence or reevaluate a witness's credibility.' [Citations.]" (*People v. Brown* (2014) 59 Cal.4th 86, 106.)

Finally, appellants argue that the trial court did not properly take into consideration their financial situation. All of appellants' assets have been in possession of the receiver since the commencement of this proceeding. Appellants state that the total value of the properties remaining in the receivership available to satisfy restitution and penalties is approximately $3,635,000, not taking into account the loss in value due to deterioration because of vacancy during receivership. Appellants assert that Jesus Aguayo testified that appellants' liabilities

33

totaled approximately $850,000.[13] Appellants assert that since the time of that testimony, attorney fees increased by approximately $300,000. Appellants claim that, even putting aside the $1,150,000 of other debt, they do not have the assets to pay the restitution and penalties.

In reaching its decision, the trial court considered all of the equitable factors presented by the parties to this matter. This included consideration of appellants' net worth. The court specifically found that appellants provided insufficient evidence regarding their net worth. The court stated: "[Appellants] have never submitted a net worth statement and counsel have been inventive with Zillow and all the rest in coming up with numerical figures. I'm regarding those as lawyer arguments rather than quantitative evidence backed claims." Thus, the court did not find the referenced property values to be credible evidence of appellants' net worth. In fact, Jesus Aguayo admitted that he undervalued some of the properties. In addition, Jesus Aguayo admitted that appellants hid assets from the court. Given the trial court's overall assessment of Jesus Aguayo's credibility, it was within the court's discretion to disregard his evidence of appellants' net worth.

Overall, appellants' arguments simply ignore evidence to the contrary and the trial court's findings. Despite the court's determination that appellants ran a "corrupt enterprise that was large scale and long term," the court noted that "[a] court imposing a penalty must strive for perspective." Noting that we live in a society where courts routinely see far worse crimes, the court noted, "[Appellants] are culpable, but their

---

[13]  In fact, Jesus Aguayo only testified to approximately $650,000 in liabilities, although he mentioned at least one mortgage on a property in receivership and did not specify the amount owed.

34

blameworthiness is not at the top of the scale." The trial court's penalties of $750 per violation were well below the statutory maximum. Appellants have failed to show that the trial court abused its discretion in determining the appropriate amount of civil penalties.

## VII. The trial court did not abuse its discretion in imposing the permanent injunction

Appellants argue that the permanent injunction is improper because it seeks to prevent appellants from engaging in legally protected activity and seeks to punish them. Appellants cite *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 103, for the proposition that "an injunction must seek to prevent harm, not to punish the wrongdoer." Further, appellants assert that injunctions that "enjoin a person from engaging in activities which are constitutionally or statutorily authorized are beyond the jurisdiction of the court and are void. [Citations.]" (*People v. Kelley* (1977) 70 Cal.App.3d 418, 422 (*Kelley*).)

The permanent injunction in this matter prevents appellants from doing the following:

"1. Attempting to use any form or variant of the doctrine of adverse possession to take any real property, including but not limited to initiating any new adverse possession claims or continuing to claim or prosecute any other claim of adverse possession;

"2. Attempting to prosecute, defend, negotiate, or settle any quiet title actions for any property;

"3. Taking any action to begin, renew, continue, or complete adverse possession of any real property in California;

"4. Transferring, purchasing, acquiring, swapping, disposing of, or otherwise performing any

35

transaction involving any adverse possession interest, current, past, or future;

"5.  Attempting to record any deeds that are out of the chain-of-title for any property, also known as 'wild deeds';

"6.  Attempting to bid on or buy, either on their own behalf or on behalf of any other person, or redeeming any unpaid taxes on, any real property listed at any tax sales auction in any jurisdiction in California, other than through a legal county tax auction process;

"7.  Redeeming or paying any unpaid taxes on any real property, other than real properties in which [appellants] are the legal titleholder.

"[¶] . . . [¶]

"9.  Making or causing to be made any untrue or misleading statement in connection with any writing, deed, or instrument related to any transaction involving real estate;

"10.  Violating any other California law."

Appellants assert that paragraphs 9 and 10 are sufficient to protect the public from any future wrongful acts by appellants in connection with real estate.  They argue that paragraphs 1 through 7 are improper because they bar appellants from engaging in legally permitted conduct.

Again, appellants face an uphill battle due to the broad nature of the trial court's discretion in making any orders "necessary to prevent the use . . . of any practice which constitutes unfair competition."  (§ 17203.)  This provision gives

the trial court "great latitude in protecting the public." (*Brockey v. Moore, supra*, 107 Cal.App.4th at pp. 102-103.)

In this matter, court enjoined the acts which formed the basis for appellants' wrongful scheme. Appellants have no protected right to engage in the process of adverse possession in the way that they did. As set forth above, the initial trespass is a crime, the collecting of rent on properties one does not own is a crime, as is the filing of false deeds. Filing quiet title actions, as well as redeeming taxes on properties, were also acts that formed the basis for appellants' unlawful, unfair, and fraudulent schemes. The trial court's decision to enjoin these activities was within its power and discretion.

The trial court noted its concern regarding possible future violations. Even before the conclusion of trial, appellants had made new false claims of adverse possession. The court emphasized that appellants "have no insight into their own wrongdoing. They are defiant and self-justifying rather than sincerely contrite. In their eyes, they are victims. There is reason to fear recidivism."

*Kelley* is distinguishable. In *Kelley,* the defendants were individuals who had engaged in the practice of dentistry without a license. The injunction prohibited them from practicing dentistry without a license but also prohibited them from indicating that they would construct, alter, repair, or sell any bridge, crown, denture, or other prosthetic appliance or orthodontic appliance. (*Kelley, supra*, 70 Cal.App.3d at p. 421.) The Court of Appeal found the injunction unconstitutionally overbroad because the construction of bridges, crowns and dentures is exempt from the Dental Practices Act. Thus, the injunction prevented the individuals from engaging in lawful work activity. (*Id.* at p. 422.) Here, in contrast, the form of adverse possession undertaken by appellants is not lawful. The

37

trial court properly enjoined each independent act in furtherance of appellants' wrongful scheme.

Appellants assert that they know what they have done wrong, and will not "repeat mistakes of the past." The trial court did not believe this, finding instead that they had no remorse or insight into their own wrongdoing. The trial court's decision to enjoin each precise misdeed in appellants' wrongful scheme was designed to ensure the protection of the public.

Further, the injunction is not as broad as initially proposed. The court noted that it "initially suggested the injunction also should bar [appellants] from obtaining real property (unless it is from people represented by independent counsel). [Appellants] have convinced the court this element is unnecessary and unwise." Thus, appellants are not barred from obtaining real property in the future. In addition, the injunction expressly does not apply to any real estate of which the appellants owned a 100 percent fee simple share as of the date of the order.

Thus, the injunction only bars appellants from obtaining property through adverse possession. The order is within the court's power and discretion.

## DISPOSITION

The judgment is affirmed.

_____, Acting P. J.
CHAVEZ

We concur:

_____, J.   _____, J.*
HOFFSTADT                    GOODMAN

_____
* Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice  pursuant to article VI, section 6 of the California Constitution.

38

Filed 5/25/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF

CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE ex rel. KAMALA HARRIS, as Attorney General,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESUS AGUAYO et al.,<br><br>    Defendants and Appellants. | B262557<br><br>(Los Angeles County Super. Ct. No. VC048452)<br><br>ORDER FOR PUBLICATION |

THE COURT:*

        The opinion in the above entitled matter filed on April 26, 2017, was not certified for publication.


        For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

1

* CHAVEZ, Acting P. J., HOFFSTADT, J., GOODMAN, J.†

†Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.